Kilty, Chancellor.
Decreed, that the property in the proceedings mentioned be sold, that James Cook be, and he is hereby appointed trustee for making the said sale, &c., the one-half of the purchase money to be paid in one year, and the residue in three equal annual payments, with interest from the day of sale, &c.
Under this decree, the trustee reported, that on the 24th day of September, 1810, he sold, subject to the dower of his widow, the real estate of the intestate to Jeremiah Booth, consisting of 397| acres of land, at $>28 50 per acre ; and an undivided half of a lot of land whereon a warehouse stood, for $1,000; amounting altogether to <£4,623 5s. 7id.; which sale, after the usual order nisi, was, on the 17th of June, 1812, absolutely ratified and confirmed.
On the 30th of July, 1812, the auditor reported, that he had stated sixteen claims of creditors, including that of the plaintiff as No. 5, exhibited against the estate of the deceased Richard Jordan, amounting to ¿61,720 12s. 2|d., including interest thereon to the day of sale, to some of which he stated objections; and that after the payment of the trustee’s commission and costs, and the full amount of the claims, there remained a surplus of £619 16s. 2-|d. out of the money received by the trustee.
20th July, 1812.
Kilty, Chancellor.
Ordered, that the statement of the claims reported by the auditor, which are not objected to by him, be confirmed, and paid by the trustee with interest thereon, in proportion as the same has been or may be received; and that the commission he retained with interest in like manner; and the costs paid to the sheriff, register, and auditor. The claims No. 9, 14, 15, and the claim of James Thompson, to stand for further proof.
On the petition of James Dali & Co., their claim No. 10, was restated by the auditor to rectify a mistake which had been made to their prejudice. And on the 12th of January, 1813, the trustee was directed to report what further proceeds of sale he had received ; and to pay away no part thereof until further order.
*286 After -which Edmund Key, by his petition, stated, that he -was the guardian of the infant defendants Richard and Ann; and therefore prayed, that the surplus of the proceeds of the sale of their ancestor’s real estate, which had descended to them, and had been sold, might be ordered to be paid to him to be invested for their benefit, &c. A similar application was also made by a letter of the 20th of May, 1816, from the said Key, addressed to the Chancellor.
On the 11th of June, 1816, the auditor reported that he had restated the claims of the creditors, amounting to $2,762 24, to pay which, the sum brought in by the trustee was not sufficient, by $124 30; which report was, by an order of the same day, confirmed. And the auditor also reported, that he had stated two additional claims, that of James Cook as No. 22, and that of Henry H. Chapman as No. 23; which were afterwards allowed; so that it would in fact require the sum of $377 21, to be brought in by the trustee to satisfy all the claims of creditors thus approved and passed.
After which the auditor was requested by the Chancellor to state the balance due to Ann Jordan ; and whatever might be necessary to forward a settlement. In answer to wdiich the auditor stated, that there was no paper from which he could ascertain how much was due from the trustee, or the purchaser; and therefore he could not say how much was due to each of the deceased’s heirs. But the trustee representing that he had in hand $1,500, he might pay into court $377 21, in satisfaction of the claims unprovided for, and divide $1,122 79, the residue, between Ann and Richard Jordan, the only children and heirs of the deceased.

17th November, 1818.

Kilty, Chancellor.
The trustee is authorized and directed to pay to the register the sum of $377 21, to be deposited in the usual manner; and of the remaining sum of $1,122 79, to pay to the guardian of Richard Jordan $561 39|; and the like sum to the guardian of Jinn Jordan, or to herself if of age.
On the 21st of February, 1822, the auditor reported, that he had stated the claim of Victoria Vincendiere as No. 24, lately exhibited against the estate of the intestate Jordan, to pay which the proceeds were ample; but that the money paid into court had been fully applied.
23d February, 1822.
Johnson, Chancellor.
The trustee in *287 this case having died, Mr. Jeremiah Booth, the purchaser of the property, is authorized to pay off the claim of Victoria Vincendiere, as stated in this account, in part of the purchase money for the property purchased of the trustee.
On the 5th of July, 1825, Ann Jordan, by her petition, stated, that there was still due to her and her brother, as the heirs of the intestate, a large amount of the proceeds of the sale of his real estate; that certain bonds which had been given by the purchaser for the payment of the purchase money had been withdrawn from this court and were not then paid; that the trustee James Cook was dead, and administration upon his personal estate had been granted to Henry G. Garner; that the purchaser Jeremiah Booth also was dead, leaving an only child, a daughter, his heir, who had since married John Llewellin, who was the administrator on the said Booth's personal estate; and that the purchase money had not been paid. Whereupon she prayed for relief, &c.
5th July, 1825.
Bland, Chancellor.
Ordered, that Henry G. Garner, the administrator of James Cook, deceased, on or before the 15th day of August next, bring into court the bonds, taken by his intestate, for the purchase money; and account for all moneys which may have been received by his intestate as trustee, or which may have come to his hands; or shew cause. And it is further Ordered, that John Llewellin and Mary his wife, upon oath, answer and say how much of the purchase money remained unpaid in the life-time of the said Jeremiah Booth, and how much yet remains unpaid; and that they bring into court that which is still due on or before the 15th day of August next; or shew cause. Provided that a copy of this order, together with a copy of the said petition, be served on the said Garner, and on Llewellin and wife on or before the 20th instant.
To this order Garner made answer on oath, as required, by returning two of the bonds given by the purchaser which had not been paid; and by filing a copy of an account taken from his intestate’s books shewing a balance of $11 69 due to him as trustee.
After which the defendants Ann Jordan and Richard Jordan by their petition stated, that the two bonds given by the purchaser, and lately brought into court, still remained unpaid; that the purchaser Jeremiah Booth, deceased, had not left personal estate sufficient to pay the said debt; and that there was then no trustee to *288 complete the trust. Whereupon it was prayéd, that a new trustee might be appointedthat the real estate which had been bought by the said Booth might be re-sold for the payment of the balance of the purchase money ; and that they might have such relief as the nature of their case required.
3d January, 1826.
Bland, Chancellor.
Ordered, that William D. Merrick of Charles county, be appointed trustee in place of the said James Cook, deceased, with all the powers with which the said Cook was invested by the decree of the 30th of June, 1810; and that he give bond, &c. in the penal sum of $5,000. And it is further Ordered, that the said trustee hereby appointed proceed to make sale of the said real estate according to the terms of the said decree; unless the said John Llewellin and Mary his wife shew good cause to the contrary on or before the 14th day of February next. Provided that a copy of this order, together with a copy of the said petition, bé served on the said Llewellin and wife on or before the 17th of the present month.
Llewellin and wife, on the 9th of February, 1826, filed their answer to this petition, shewing cause as allowed by this order, in which answer they state among other things, that their intestate Booth had purchased the real estate as stated; that he died on the tenth of November, 1824; and that sundry payments had been made by him to Edmund Key, the guardian of the petitioners under the authority of this court, and with the consent of the said trustee Cook, See.
After which it was agreed, that no re-Sale was to be made until the auditor had stated an account ascertaining the balance due from the estate of Booth, the former purchaser; and that thirty days thereafter should be allowed for making payment. The report of the auditor to be affirmed, as of course, unless objected to within seven days after notice thereof. Upon this agreement the case was, by an order of the 14th of April, 1826, referred to the auditor to state an account accordingly.
In a report, filed on the 19th of June, 1826, the auditor says, that he had stated the account therewith returned between Jeremiah Booth, deceased, the purchaser, and estate of Richard Jordan, deceased, wherein he,had charged the said Jeremiah Booth with the amount of his bonds given for the two last instalments of the purchase money. And allowed all the payments claimed by the answer of John Llewellin and Mary his wife to the petition of Ann
*289 Jordan and Richard Jordan; that is, No. 1, of $1,000, paid by Booth to Key on the 15th of March 1813 ; No. 2, of $115, paid by Booth to Key on the 15th of August, 1814; No. 5, of $11, paid by Booth to Key on the 14th of January, 1817, &c. There appears due from Jeremiah Booth, deceased, a balance of $2,018 93, with interest thereon from the 19th of February, 1825. And that he had stated this account at the instance of the solicitor of Llewellin and wife from the exhibits filed with their answer, subject to any exceptions that the petitioners might file to any of the credits.
After which an agreement was filed in the following words, to wit: ‘It is agreed in this ease, that the account and report filed by the auditor, on the 19th of June, 1826, be ratified and confirmed as reported; and that the land mentioned in the proceedings be sold under the decree of this court for the payment of the balance due by the estate of Jeremiah Booth to the estate of Richard Jordan, to wit, the sum of $2,018 93, with interest from the 19th day of February, 1825, and costs ; upon the following terms, to wit, one-fourth cash, the residue in three equal annual instalments, with interest from the day of sale; Provided, nevertheless, that no sale shall be made of the said premises before the first day of September, eighteen hundred and twenty-seven. It is further agreed, that there shall be no appeal on either side. And it is further agreed, that if a sale should be made under this agreement, if it should be made appear to the satisfaction of the Chancellor, that there are other moneys due to the heirs of Richard Jordan from the estate of the said Jeremiah Booth, that then, and in that case, the proceeds of the said sale shall be applied to the payment thereof, as well as to the before mentioned sum of $2,018 93, with interest and costs; provided there are no other claims against the estate of the said Jeremiah Booth entitled to a preference, or participation in the fund.’
21st March, 1827.
Bland, Chancellor.
Ordered, that in pursuance of the foregoing agreement, the account heretofore made and reported by the auditor be ratified and confirmed; and that unless the respondents pay to the petitioners the sum of $2,018 93, with interest thereon from the 19th day of February, 1825, and costs; that William D. Merrick, the trustee heretofore appointed for that purpose, proceed to make sale of the said premises pursuant to the said agreement.
On the 13th of August, 1827, the auditor reported a statement which he says was prepared at the instance of the solicitor for the *290 purpose of ascertaining the interests of Ann Jordan and Richard Jordan in the balance heretofore reported to be due from Jeremiah Booth, deceased, to the estate of Richard Jordan, deceased. The moneys paid to the trustee and to Edmund Key, as guardian to Richard and Ann Jordan, are excluded from this statement. It is impossible to ascertain the proportions in -which these persons were respectively benefited. The sums so paid were legally applicable to their use in equal moieties, and it is presumed were so applied.
Under the order of the 21st of March, 1827, the trustee Merrick réported, that he had, on the 15th of October, 1827, sold the said tract of land called Brambly, containing 397| acres, with a small lot of land contiguous thereto on which was an old tobacco warehouse, to Joseph Stone for the sum of $6,958 75, which sale, after the usual order nisi, was absolutely confirmed on the 17th of March, 1829.
On the 19th of March, 1828, Joseph Stone and Alexander McWilliams by their petition, in behalf of themselves and the other creditors of Jeremiah Booth, deceased, stated, that they had obtained a judgment in St. Mary’s County Court, which was affirmed by the Court of Appeals at June term, 1825, against a certain James Walker and the said Jeremiah Booth, since deceased, intestate, leaving the said Mary Llewettin, widow of the said John Llewellin, now deceased, his only child and heir, for the sum of $6,433 39 debt, $13,000 damages, $5 6| costs on the original judgment, $5 53§ costs on the fiat on the scire facias and costs, to be released on payment of $6,433 39, with interest from the 13th of July, 1822, until paid, and the above costs; subject to certain credits thereon given, as appears by a copy of the said judgment therewith exhibited. That James Walker, the surviving defendant, was insolvent; and that the said Jeremiah Booth had died insolvent, and without leaving personal estate sufficient for the payment of his debts. And that there was yet a very large sum of money due to these petitioners after allowing all credits. And they had an equitable lien upon the equitable interest of the said Jeremiah Booth, deceased, in the real estate re-sold as aforesaid; and upon the balance of the purchase money arising therefrom, for the payment of their claim. Whereupon they prayed, that the balance of the said purchase money might be applied to the satisfaction of their claim, and for general relief.
22d March, 1828.
Bland, Chancellor.
Ordered, that a copy of this order, together with a copy of the said petition, be served *291 on the said Mary Llewellin, on or before the 19th day of May next, to the end that she may shew cause, if any she hath, why the said surplus should not be applied, as prayed, to the satisfaction of the just debts of the said Jeremiah Booth, deceased. And it is further Ordered, that the said trustee, by a publication of this order, to he inserted in some newspaper twice a week for three successive weeks before the 19th day of April next, give notice to the creditors of Jeremiah Booth, deceased, to file the vouchers of their claims in the Chancery office, on or before the tenth day of July next.
On the 20th of March, 1828, Richard II. Lee and Ann his wife, formerly Ann Jordan, and Richard Jordan, by their petition, stated, that when the sale of the 24th of September, 1810, was made of the real estate of their father Richard Jordan, deceased, they were infants, and Edmund Key was then their duly constituted guardian, and as such received from the said trustees, who made that sale, and from the said Booth, the purchaser, under the order of this court, out of the proceeds, and on account of the said sale, the sum of $3,972 07, of which this petitioner Ann received from the said Key only $167 03; and this petitioner Richard only $388 22, making together but $555 25, leaving still due to them, from the said Key, the sum of $3,416 82, exclusive of interest; that the said Booth was one of the sureties in the bond given by the said Key as guardian of the petitioners; and being so liable, until that amount was fully satisfied, said Booth could never have obtained a legal title to said real estate; and that therefore, it was still a lien, and must operate as such upon the proceeds of said sale made by the trustee Merrick; or at any rate, that for such amount the petitioners were entitled to come in equally with all other creditors of every description upon the said proceeds. That the said Key, for some years past had been, and still was wholly insolvent; and had obtained the benefit of the insolvent laws since his receipt of the said sums of money. That since the said order for a re-sale, the petitioner Ann married the petitioner Richard II. Lee. Whereupon the petitioners prayed to have the benefit of the answer of the said Edmund Key, and that a subpoena might be directed to him; and that they might have such other and further relief as the nature of their case might require. Upon which a subpoena was issued accordingly.
The auditor, on the 18th of March, 1829, made a report in *292 which he represented that he had, from his statement of the 13th of August, 1827, stated the claims of the two heirs of Richard Jordan, deceased, shewing a balance, including interest up to the date of the present report, of $1,630 66, due to Lee and wife as claim No. 1; and $399 91 still due to Richard Jordan, the other heir, as claim No. 2; which sum awarded to Richard was claimed by Thomas W. Harris and the said John Llewellin, as his assignees. That on the claim of Stone and McWilliams, No. 3, which was on a judgment recovered against the said Jeremiah Booth, deceased, and a certain James Walker, there was due, including interest up to the 15th day of October, 1827, the day of the sale by the trustee Merrick, the sum of $5,754 98; but there being no proof of the insolvency of Walker, only one moiety thereof was allowed out of Booth's estate. And that of the amount claimed by the petitioners Lee and wife and Richard Jordan, of $1,000 paid by the said Booth on the 15th of March, 1813; $115 paid by the said Booth on the 15th of August, 1814; and $11 paid by the said Booth on the 14th of January, 1814; and $430 66 paid by the late trustee Cook on the 13th of January, 1819, after giving the admitted credits, there remained a balance, including interest, of $1,718 64, as having been paid to the said Edmund Key, their guardian, for whom the said Booth was surety, there was no proof; and that, if there were, it ought to be postponed to the claim No. 3.
Immediately after which, on the same day, an agreement was filed in the following words, to wit: ‘It is admitted, that Jeremiah Booth, the deceased, was one of the securities upon the bond executed by Edmund Key, as guardian of the petitioners Richard Jordan and Ann Lee; that said Key was duly appointed and qualified as guardian of said petitioners; that the payments appearing to have been made to him out of the proceeds of the first sale of the land in the proceedings mentioned by the auditor’s report and account, this day filed, were made to him while he was such guardian ; and that only such part thereof was paid by him to, or for the said petitioners, as is credited in said account; and that the said Key is and was, at the time of the. re-sale of said property, wholly insolvent. It is also admitted, that the petilioner Ann is the wife of the petitioner Richard H. Lee.'
By agreement the auditor, on the 17th of July, 1829, stated and reported an account awarding to Thomas W. Harris $118 15, and to William H. Plowden, administrator of John Llewellin, deceased, *293 $281 76, as assignees of Richard Jordan, being the full amount due him, as heir, for his share of the purchase money, as stated by the auditor’s report of the 18th of March, 1829. And on the 31st of July, 1829, the auditor made another statement, in conformity thereto, awarding, as before, $1,630 66 to Lee and wife, as their share of the before mentioned admitted balance of the purchase money, leaving the sum of $4,609 58 of the proceeds of the sale made by the trustee Merrick, unappropriated. Which report was, by an order of the 30th of September, 1829, confirmed, and the proceeds directed to be applied accordingly.
Stone fy McWilliams, by their petition, asked leave to take testimony in support of their claim against the estate of Jeremiah Booth, deceased, for its whole amount, by proving the insolvency of Walker, &c. Which leave, by an order of the 24th of June, 1830, was granted as prayed; and testimony was accordingly taken and filed proving the insolvency of Walker.
After which the petitioners Lee and wife and Richard Jordan, excepted to the auditor’s report of the 18th of March, 1829. 1.
Because they were entitled to be preferred to the amount of their claim over the other creditors. 2. Because, if not entitled to be preferred, they were to come in equally for it with such creditors. 3. Because they were therein charged with the sum of $555 25, as if the same were admitted by their petition to be an amount received by them in addition to the amount already charged to them, or credited to Jeremiah Booth in the auditor’s account filed on the 19th of June, 1826, and otherwise charged to them in the accounts and proceedings in this case; while, in fact, the said sum of $555 25 is the aggregate of items marked in said account filed on the 19th of June, 1826, No. 3, 4, 5, 6, 7, 8 and 12; and in that account accordingly credited to the said Booth; the items No. 5, $11, and No. 7, $157 03, being those assumed by Jinn the petitioner, in her said petition as received by, and paid for her separate account, in all $167 03; and items No. 3, $98; No. 4, $40 15; No. 6, $134 91; No. 8, $50; and No. 12, $65, being in like manner there so assumed by the petitioner Richard; being in all $388 22; as these respective totals are apportioned in said petition. And 4. Because the said Booth is not charged with the further sum of $219, part of the commission of James Cook, the trustee, which sum said Cook, in his account reported by him on the 13th of February, 1819, to the court, declares he paid over to the guardian of the petitioners, Edmund Key, for their use. The *294 petitioners accordingly insist, that said sum be charged with interest thereon from the 31st December, 1812.
18th January, 1831.
Bland, Chancellor.
The exceptions to the auditor’s report standing ready for hearing, and the solicitors of the parties having been fully heard, the proceedings were read and considered.
Before we proceed it may be well to take a retrospective view of the proceedings in this case to see how the present litigants, by the consequences of, and the allowable ingraftments upon the original suit, have come in, or been brought before the court, in order, that we may the more clearly understand the relative positions which they hold, and the nature of the present controversy.
The original bill was filed by a creditor in behalf of himself and the other creditors of Richard Jordan, deceased, to have his real estate sold for the payment of his debts. That real estate was sold accordingly. Sundry other creditors came in, and established their claims, and a distribution of the proceeds of that sale, so far as was necessary to satisfy all those creditors, has been made among them. The original bill, as to them, has performed its office; and the suit, as to the original plaintiff and all others who became associated with him, for a similar purpose, has been thus brought to a final conclusion.
It appears, however, by the order of the 23d of February, 1822, that although the proceeds of sale were amply sufficient to pay all the creditors; yet, as all the moneys which had been brought into court, by the trustee, had been applied as directed; it became necessary to authorize the purchaser to pay the last of the claims which had been brought in and established; because of the trustee’s being then dead. It being deemed safe and convenient upon that, as on former occasions, to authorize a payment directly from the purchaser to a creditor, or party, or even the assignment to a creditor, or party of the purchasers’ bonds, without requiring the proceeds to be collected by and passed through the hands of a trustee in payment. (a)
But before the original cause of suit had been thus brought to a conclusion by the payment of all the debts of the intestate Jordan, the trustee having died, and there appearing to be a large amount of the purchase money still remaining unpaid, to be collected and passed over to the then infant, now adult, heirs of the deceased *295 debtor; and it also appearing, that the guardian of the infant heirs had come in, and asked to have the surplus paid to him; that a large sum had been ordered to be paid to him: and that Booth, the purchaser, was then dead, it became necessary to ascertain the amount of the purchase money then due ; and also from whom it was to be collected.
Considering a trustee, appointed to make a sale under a decree, as an officer or agent of the court, bound by the terms and manner of his appointment, to obey its orders; and to hold himself ready to account at all times and immediately when called on; and holding, on the death of such a trustee, that his responsibility, so far as regards any property which may have come to his hands, in virtue of the trust reposed in him, devolves upon his personal representatives; the court deemed it to be entirely within the scope of its powers; and also to be most beneficial for all concerned to proceed in a summary way against the administrator of this deceased trustee. (b) Accordingly, upon an order to shew cause, Henry G. Garner, the administrator of the trustee James Cook, deceased, without objecting to the legality of such a mode of proceeding, as indeed he could not, answered so fully as to shew, admitting the truth of the circumstances set forth by him, that his intestate had fully discharged his duty in all respects; and the truth of his answer not having been controverted, the proceedings against him were thus, at once, brought to a close; and he too was thus discharged from all concern with any further proceedings in the case.
But on its being also alleged by the heirs of the intestate Jordan, that there was a large amount of the purchase money unpaid; it was found that the court could not deliver itself of the property which it had undertaken to administer, without calling on the purchaser to pay what remained due; and on his failing to do so, to proceed against him. According to the principles of the English adjudications there could be no doubt, that the purchaser himself might, by a summary proceeding, at the instance of any one interested, be compelled to comply with his contract, and pay the purchase money. This court, it was confidently believed, might, upon similar principles, proceed in a like summary manner to enforce the payment of the purchase money, (c) And it could have *296 had no hesitation, at the instance of any one interested, so to have proceeded against the purchaser Jeremiah Booth himself; but he was dead. His liability, however, it was obvious, had, in this respect, devolved upon his representatives, so far as they had assets. And therefore, an order was passed, calling on his heir and administrator to pay the balance of the purchase money, or shew cause. John Llewellin and wife accordingly, among other things, shewed for cause, that the deceased purchaser Booth had, as they alleged, under the authority of the court, and with the consent of the trustee, made sundry payments to the trustee, and also to Edmund Key, the guardian of the infant heirs, leaving a balance still due, &c. Whereupon it was agreed and adjudged, that no more than $2,018 93 of the purchase money then remained due. There was no doubt, that the court, as the vendor, for the benefit of all concerned, to the extent of the purchase money unpaid, held an equitable lien upon the estate sold to Booth; and there was no doubt, that in virtue of that equitable lien a re-sale of the estate might be made for the payment of the purchase money. Upon those grounds therefore, the trustee Merrick was appointed; and a re-sale was ordered and made accordingly.
Thus, by a consequence of the original suit, a new controversy arose, after the original plaintiff had been satisfied, and had departed from the case, between the original defendants, now placed in the position of plaintiffs against the representatives of the deceased purchaser as defendants. This new controversy, as regarded the balance of the purchase money, admitted to be due, was, by its payment, in that particular, terminated; and the case, in that respect also, finally brought to a close.
The heirs of Richard Jordan, deceased, had, however, by their petition alleged, that a large amount of the purchase money had, during their infancy, under the order of the court, been paid to Edmund Key, their guardian, by the trustee Cook, and by the purchaser Booth, and been wasted by the said Key, who had thereafter become and then was insolvent; and that Booth, the purchaser, having been bound, in a guardian’s bond, as one of his sureties, they had a lien upon Booth’s estate for the amount so paid to and wasted by Key. Therefore, as Key was, as they alleged, no party to these proceedings, they prayed, that he might be summoned as such, that they might have the benefit of his answer. It being a general rule, that all co-obligors must be made parties, it seemed to have been conceived to be proper thus to ask to have Key *297 brought before the court. But, admitting, that he had not by his petition to have the proceeds paid to him submitted to be treated as a party, as a co-obligor who is insolvent need not be made a party; Key, who was alleged and shewn to be so, was not a necessary party; since no decree against him could be of any avail; and his answer, as such, could not be read against any other party. Consequently, all further proceedings against him being useless, the case as to him also was thus brought to a final close.
But Stone &f McWilliams, by their petition, stated that they were judgment creditors of Jeremiah Booth, deceased, who had died without leaving personal estate sufficient to pay his debts ; or any other real estate than that which had been sold under the decree in this case, leaving a large surplus of the proceeds of sale still undisposed of; and that his administrator John Llewellin, was dead, leaving a widow Mary, who was the daughter and only heir of Booth. This new cause of complaint, thus ingrafted by this petition upon the remaining stock of this case, gave to it an entirely new character, and converted it into a creditor’s suit against the heir of Jeremiah Booth, deceased.
As regards the claim of Stone &( Me Williams, as here presented in conflict with that of the heirs of Richard Jordan, deceased, there can be no occasion, at present, to notice the heir of Booth; and the case, as to her, may, so far as regards the question now to be determined, be considered as finally closed; since it has been thus, in fact, reduced to a mere contest between these two rival creditors of Jeremiah Booth, deceased, arising out of their respective claims to a preference of satisfaction out of the surplus of the proceeds of the sale of his real estate.
It has been urged, that Jeremiah Booth had at no time, during his life, any thing more than a mere imperfect right or equitable interest in the real estate from the sale of which this surplus has arisen ; and that his estate was not one upon which the judgment of Stone McWilliams could give them a lien.
This objection points to a portion of our law of a most important bearing, and of frequent application; and yet is one which has not, that I know of, been any where carefully examined and considered. I shall, therefore, avail myself of this occasion to take a more comprehensive view of the subject than might otherwise have been deemed necessary for the determination of this case.
*298 According to the law of England, a judgment of a court of common law operates as a general lien upon all the real estate of the defendant, which may be taken in execution and sold, or delivered under an elegit, or extended by a statute merchant or statute staple for the satisfaction of such judgment or recognizance. This lien is not the result of any principle of the common law applicable indiscriminately to all judgments in favour of a creditor; but arises out of the liability of the real estate to be taken in execution and sold at the common law, or out of the statutes that give the elegit, and recognizances called statute merchant and statute staple, by virtue of which the lands of the debtor were generally made liable to be sold, delivered, or extended; (d) and although only a moiety of the land could be taken under an elegit; yet the lien is general and comprehends all the lands held by the debtor, as well those which he had at the time of entering up the judgment as those which he may have subsequently acquired. And this lien fastens upon the real estate on the day the judgment is rendered, (e) This judgment lien is a uniform consequence of the real estate being liable to be taken and extended under an execution issuing upon such judgment. Wherever then such a liability exists, the lien arises as the constant incident of such a judgment; and where the property cannot be taken in execution, there is no lien. It will, therefore, be sufficient in this, or any similar case, to shew the liability of the real estate to be so taken in execution, to establish the existence of the lien. (f)
The lien upon a real estate, which is incident to a judgment against its owner, extends no further than to cover the whole of that right which he himself might have voluntarily transferred to his creditor in satisfaction of his debt; its operation is always limited by the extent of the debtor’s power of alienation. The alienation of lands is either voluntary, as by deed inter vivos, or by last will and testament; or it is involuntary as by attachment of law.
During the existence of the feudal system, all kinds of alienation by the feudatory were prohibited, because of their being contrary to the tenor of the grant. The tenant could not will or *299 devise his land ; or in any way encumber it with the payment of his debts; and hence a creditor who had recovered judgment against him, could not take it in execution for the satisfaction of his debt; so that, by the feudal law, lands were entirely exempted from being taken in execution, and sold for the satisfaction of the debts of the holder. The feudal restrictions upon voluntary alienations, were giving way before the general spirit of the times, when the statute de donis repeated what the law of tenures had before said, that the tenor of the grant should be observed; and this created that pernicious species of fettered inheritances called estates tail; which have also yielded to public utility; and have at length, in our country, been almost totally annihilated. The right of alienation by last will and testament, has been made absolute in almost all respects. (g)
The restrictions upon involuntary alienation by attachment of law, have not been so entirely removed. The tenant may, in some cases, voluntarily alien his estate where it cannot be at all, or to a very limited extent, affected by an execution upon a judgment against him. As in the case of a mere empty legal estate, the trust of which is possessed by another; (h) or in the instance of a tenant in tail, whose estate has been saved from the operation of the act to direct descents; (i) who may, if he thinks proper, bar the intail in the mariner allowed by the act of Assembly, and alien the estate; (j) yet if he neglects or refuses to dock the in-tail, and have it converted into a fee simple in himself, his creditor, who has obtained a judgment against him, can only take the estate during his life, in satisfaction of his debt; and after his death it will pass to the heir intail, entirely discharged from all the debts and incumbrances of the last tenant intail, (k) Therefore, although a judicial lien can extend no farther, in any case, than the defendant’s power of alienation; yet it is not in all respects co-extensive with it. But where the real estate is devisable by law, no disposition can he made of it to the prejudice of creditors; and therefore, it may he safely affirmed, that a judicial lien is, in most respects, commensurate with the legal right of testation. (l)
*300 From all which these general principles seem to follow, that, at common law, lands not being alienable by the feudatory, and therefore not liable for the payment of his debts, it was presumed, that he was trusted only upon his personal security; and the judgment being in pursuance of the contract, was only to recover a personal thing; and the execution following the judgment went only against the goods ; (m) that a statutory and judgment lien attaches on no real estate which is not liable to be taken in execution ; that it in no case extends beyond the debtor’s power of voluntary alienation; and that it fastens upon the realty subject to all superior rights and prior liens by which that power of alienation is or may be limited or restrained, as by a right of dower, prior mortgages, &c. (n)
From a very early period, it appears to have been common to lease lands for years; but such leases were originally and most usually granted to mere husbandmen, whose interest was esteemed of so little consequence, that they were rather considered as the bailiffs or servants of the lord, who were to receive and account for the profits at a settled price, than as having any property of their own; and therefore, they were not allowed to have a freehold estate; but their interest, such as it was, vested after their deaths in their executors, who were to make up the accounts of their testator with the lord and his creditors, and were entitled to the stock upon the farm. Hence it grew into an established principle, that these leases, or chattels real, as they are called, might be taken in execution and sold like mere moveables, for the satisfaction of debts. (o)
Here there is no leasehold estate in question ; and therefore, in speaking of this judgment lien, my remarks must be confined to freehold estates upon which such a lien may attach. (p)
According to the ancient law of England, a villein being himself a subject of property, whatever property he himself acquired might be taken and held by his owner as an incident, or perquisite of his right of property in such villein. Consequently, if an executor had a villein for years, and the villein purchased lands in fee, upon which the executor entered, he should have the whole fee simple; but because he had the villein in autre droit, that is, as executor, it should be assets in his hands. (q) This is a sin *301 guiar instance in which lands held in fee simple might become assets in the hands of an executor; and, as such, liable, by the common Jaw, to be taken and sold for the payment of the debts of the deceased to whose estate the perquisite had accrued. But as villenage has long since ceased in England, this law has certainly become obsolete there ; yet I can see no reason why the same law might not he applied in Maryland as to any real estate which might be conveyed to a slave with the consent of his master, who held him as an executor or administrator. (r)
Where a man by his writing obligatory under seal bound himself and his heirs for the payment of a sum of money and died, leaving an estate in lands which descended to his heir; the creditor, on obtaining judgment upon his obligation against the heir, might, by the common law, not by any statute, take in execution all the lands which descended to the heir; although he could not have had execution of any part of them against the ancestor himself. This ensued as a necessary consequence of allowing the ancestor to bind his heir as well as himself for the payment of a debt. For, having given an action against the heir, the creditor could have had no fruit of his action unless the lands descended could be taken in execution; because the goods and chattels of the deceased belong to his executor or administrator, and the lands only descend to the heir; and neither of them could be charged further than to the amount of the assets which came to his hands. But if the obligee sues and obtains judgment against the obligor, in his life-time, the debt is placed upon a new and a different foundation ; and the claim becomes extinct as a debt resting upon a security by which the heir is bound. The judgment extinguishes it as a bond debt, and discharges the heir. And therefore, a bond creditor who has thus obtained judgment cannot after the death of the ancestor, by a scire facias, or in any other manner charge the heir, or affect the lands which may have descended to him. Whence it appears, that, in some instances, at common law, a creditor might be in a better situation before than after be had obtained a judgment against his debtor, (s)
In all cases, at the common law, if the party who should be *302 charged had aliened the land, bona fide, before any action brought, the land in the hands of the purchaser was not subject to any charge or execution. A bond is not properly an incumbrance upon land; for it does not follow the land like a judgment. But if an action of debt be brought against the heir upon the obligation of his ancestor, and the heir aliens the land pending the suit; yet shall the land, which he had at the institution of the suit, be charged ; because, the action was brought against him in respect of the land. Hence it appears, that the common law lien of a bond creditor as against the heir, relates to the institution of the suit and fastens on the land from that time. Consequently, where there were two creditors, A. and B. of .7. S. whose heir was bound, and who had lands by descent. And A. brought suit and obtained judgment by default on the first of March, 1686, upon which he issued a general elegit against all the lands of the heir, a moiety of which was delivered to him accordingly. And B. who had instituted his suit on the first of July, 1684, and obtained a special judgment against the assets confessed by the heir on the first of September, 1686. It was held, that although B’s judgment was subsequent to A’s, yet B’s having relation to the institution of the suit, which was commenced before A. obtained his judgment, it operated as a lien from that time, and therefore must be first satisfied. (t)
Land in the English colonies was considered as partaking much more than in England of the nature of mere commercial property, (u) It is said, that there are instances of colonial estates having been sold under the authority of the Court of Chancery of England; according to the law of which court, where a bond or judgment creditor was under the necessity of going into equity to reach the real estate of his debtor, he would not be compelled, as at law, to wait until he could, as under an elegit, obtain satisfaction according to an extended value; but the court would accelerate the payment by ordering a sale of a moiety of the estate or so much as might have been extended at law. (w)
*303 Before the year 1732, it was, in general, true, that lands in Maryland were no otherwise liable to be taken or extended in satisfaction of debts than according to the law of England; and prior to that time there are many instances in which lands were so extended by elegit. But the peculiar circumstances of the province; the scarcity of money, and the small proportion of personal to real estate seem to have given rise to a wish among the people, that land should, in some way, be made entirely subject to be seized and sold for the satisfaction of debts. This general disposition is indicated by some principles peculiar to our law in relation to imperfect legal titles; to equitable interests in land ; and to the real estates of deceased debtors which were established as a part of our code antecedent to that period.
In that interval of time between the designation of a tract of land, by a specification of a special warrant or otherwise, and the obtaining of a patent for it, the purchaser was considered as the holder of an inchoate legal title, a perfectible legal interest regarded as a sort of chattel real, which upon being completed by a patent was deemed a legal title, from the date of such designation, to all intents and purposes. So long as the right remained as a chattel real it was, like all other chattels, liable to be taken in execution and sold for the satisfaction of debts; but a patent, by perfecting the legal title, immediately removed it beyond the reach of creditors in that way. To prevent this any creditor was allowed to file a caveat in the Land Office for the express purpose of stopping a patent, and so continuing the interest as a chattel real, and keeping it within reach of his remedies. But this imperfect legal title, although deemed a chattel real for the benefit of creditors, was, in all other respects, considered as real estate; and as such descended to his heirs, and did not pass into the hands of the executor or administrator. Yet where the debtor himself, not having, during his life-time, perfected his title, had died without heirs, a patent was directed to be issued to his executor or administrator to be treated as assets for the satisfaction of his debts and legacies. These were the settled rules of law with regard to any specified tract of land for which an individual had obtained from the Lord Proprietary an imperfect legal title short of a patent. (x)
But such a peculiar chattel real, as it was called, must not be confounded with a mere common warrant, before it had been laid *304 upon any land, which was considered as nothing more than a general authority to acquire a title to so much vacant land any where within the state. Such a common warrant, not being the commencement of a title to any land in particular, was always considered as mere personalty, as a sort of chose in action, which, on the death of the holder, was held to be assets in the hands of his executor or administrator. And these principles of law seem to have been affirmed by legislative enactments since that time. (y)
There is a singular instance to be met with among the records of the Land Office, in which lands were made liable for the satisfaction of the debts of its deceased owner. Instead of an extent, or an absolute sale of a part, as in England, in acceleration of payment; an inquest was ordered to ascertain the annual value of the whole, and what number of years at that value, would be equal to the whole amount of the debts due; and then a lease was sold, clear of dower and all other incumbrances to a bidder for the shortest term not exceeding the time so ascertained. (z)
There appears to have been several private acts passed at an early period of the provincial government, authorizing the sale of the lands of deceased debtors for the payment of their debts; (a) but it does not seem to have been a common practice; nor to have been an occasional mode of interposing to remove an evil or supply a defect in the general law.
In the year 1732, at the instance and solicitation of merchants, resident in Great Britain, trading to this country, the British Parliament passed an act making lands in all the colonies liable to be taken in execution and sold for the satisfaction of debts. Whatever were the motives for passing this statute, it is certain, that it was most manifestly just in itself; and was such a one as fully met the approbation of the people of Maryland. (b) It at once *305 removed a long train of difficulties and inconveniences, and was accordingly adopted almost immediately without opposition and *306 entirely; as well those provisions for obtaining proof of debts iii Great Britain, (c) as that section which subjected all lands to be taken in execution and sold for the payment of debts, (d) But the first section which gave a new mode of taking proof in Great Britain, then a part of the common empire, must have been renounced by our Declaration of Independence, by which all community of law and government between Great Britain and Maryland was severed, (e) In those of the colonies in which lands had been made liable to be taken in execution by their own laws, this statute was unnecessary; and, as indicated in its preamble¿ was not intended to apply to, and was therefore not adopted by them, (f) It was reluctantly, but finally submitted to in Jamaica. (g) In North Carolina, it was received and applied much in the same manner as in Maryland. (h) In South Carolina, Georgia and Jamaica, it was adopted and so applied, as that, on the death of the debtor, his real estate was converted, with re *307 spect to the payment of his debts, into personalty; and as such, held to be assets in the hands of his executor or administrator for the benefit of his creditors-. (i) In Virginia, that section which subjected lands to the payment of debts, was rejected and nullified, as an unconstitutional encroachment upon her sovereign rights; (j) but the first section providing a mode of collecting proofs in Great Britain, was admitted to be in force there until our Declaration of Independence. (k)
It has been often said, that this statute in itself made a distinction between the people of Great Britain and those of the colonies ; that domestic debts were not included by it; and that by an equitable construction only it was so extended as to embrace Maryland as well as British creditors. (l) It is true, that it may have been passed at the instance of British merchants; and the first section which makes provision for the manner of proving debts, could, from its nature, be only applied for the benefit of those resident in Great Britain, and not to the inhabitants of the Plantations. But the fourth and most important section, and the only one now in force, makes no distinction whatever as to the residence or domicile of the party. On the contrary, all distinctions arising from the local situation of the party, or his being a subject resident in Great Britain, or in the colonies, or in any other part of the British dominions, or his being a subject trading to the Plantations, are expressly excluded by the strong phraseology of the law itself; by which it is declared in the clearest terms, that the real estate situate in the Plantations, shall be chargeable with all just debts owing by any person to his majesty, or any of his subjects; without any allusion whatever to the residence, domicile, or trading character of the subject or persons thus described as debtors or creditors; nor is there any distinction as to the kind of debts; the estate is made chargeable with all just debts, duties and demands of what nature or kind soever.
Real estates having been thus made ‘subject to the like remedies, proceeding and process,’ as personal estate, towards the satis *308 faction of such debts as were ‘due by bond or other specialty dt followed as a necessary consequence, that upon a judgment against the debtor himself his lands might be taken and sold by a fieri facias; and in order that the writ itself should express this new extension of the authority it gave, the words ‘lands and tenements,’ were inserted so as expressly to command the levy to be made ‘of the goods and chattels, lands and tenements,’ of the defendant. (m)
The English statute of 1285, (n) declares, that ‘when a debt is recovered or acknowledged in the king’s court, or damages awarded, it shall be henceforth in the election of him that sueth for such debt or damages to have’ an elegit to extend one-balf of his land, &c., which gives the election immediately as soon as the debt is recovered ; and therefore, the land is bound immediately from the time of the recovery of the debt; (o) and so the words of this statute of 1732, fixes the liability of the whole from the time of the recovery ; and therefore, the lien attaches from the date of the judgment. (p) The English statute of 1285, gives the elegit to obtain satisfaction for ‘such debt or damages.’ This statute of 1732, speaks only of ‘debts, duties, and demands;’ and would seem to have relation only to cases arising between persons who stood in the relationship towards each other of debtor and creditor before the institution of the suit. But it has been always construed to extend to all cases where the plaintiff recovered a judgment for a certain sum of money, and thereby became a creditor of the defendant; although the foundation of such a judgment debt was, in truth, not a pecuniary claim, but a mere trespass or personal injury. Hence this statute of 1732, like Some others in which the same terms are used, comprehends not only debts, in their proper sense, but duties or things due, as Covenants, rents, fines, issues, or just causes of action; for, debt, in its large sense, signifies whatever a man owes. (q)
This statute of 1732 specifies the extent of the liability of lands, by declaring that they shall be assets in like manner as real estates are by the law of England liable to debts due by bond; and shall be subject to the like remedies, proceedings and process in any court of law or equity, for seizing, extending, selling or disposing of them, and in like manner as personal estate. From which last *309 expressions it would seem, and it has been so understood by some here, that land might be taken in execution by process emanating from any court whatever; as well from the lowest as from the highest, and as well from a court of record as from one not of record. If so, there can be no doubt that lands might be taken and sold by virtue of an execution issuing upon a judgment rendered by a justice of the peace. (r)
But this statute of 1732, points to another analogy which casts much light upon this subject; it declares, that lands shall be assets in like manner as real estates are by the law of England liable to the satisfaction of debts due by bond. Now it is clear, as has been shewn, that lands, in England, can only be made liable as assets for the satisfaction of such debts by a suit in a common law court of record, or in a Court of Chancery. Whence it may be strongly inferred, that as land cannot be taken in execution under any process emanating from a court not of record in England, it cannot be sold by virtue of an execution upon a judgment rendered by a justice of the peace here, whose jurisdiction, in regard to small debts, cannot, in any respect, be considered as that of a court of record. And besides, where lands are sold under a fieri facias, it is necessary that the execution should be returned in order that there may be written and recorded evidence of the title so conveyed; but, although an execution from a justice of the peace may be returned, there is no law authorizing it to be recorded, and recognized as evidence of that grade and for that purpose, (s)
This statute of 1732, provides, that houses, lands and other hereditaments and real estate, shall be chargeable with all just debts; and then proceeds to declare, that they shall be assets for the satisfaction thereof in like manner as real estates are by the law of England liable to the satisfaction of debts due by bond. This latter specification of the manner of the liability, has been considered as an indication of the kind of the real estate intended to be embraced by it; and taking this as the criterion by which to ascertain how far any interest in lands or real estate of any description should be considered as having been subjected to the payment of debts by this statute, it has been applied, certainly to
*310 the full extent of the English law; and, in some instances, apparently in accordance with the previously settled principles in relation to imperfect legal titles and equitable interests, carried farther as to such interests; although nothing more than the legal title or equitable interest of the defendant could, in any case, be sold; as to which the purchaser is considered as standing in the place of the defendant. And therefore, it has been held, that a real estate held intail could not be subjected to the payment of the debts of the tenant intail further than to the extent of his interest; so that, after his death, the heir intail should take the estate, as by the law of England, entirely unincumbered with any such liability. (t)
By this statute of 1732, cthe houses, lands, negroes, and other hereditaments and real estate,’ belonging to any person indebted, are made liable for all his just debts. The lien which a creditor obtains by his judgment upon the real estate of his debtor, arises as a necessary consequence from this liability. Therefore, such a lien only fastens upon that which may properly be denominated real estate; because by the statute of frauds it is declared, that no writ of execution shall bind the property of the goods of the party against whom it issued, but from the time of its being delivered to the sheriff. In reference to this distinction, therefore, it may often be necessary to ascertain whether the property of the debtor be, in fact, real estate or not.
It may also frequently become necessary to ascertain whether the thing be real or personal estate, not only with a view to the nature and commencement of the lien by which it is proposed to be bound; but also in reference to its ownership, so as to shew whether it can be, in any manner, liable to be taken in execution under the writ by virtue of which it may be attempted to be soldi For, no real estate can be bound by a judicial lien but that which belongs to the defendant; nor can any real or personal estate but his be taken in execution. Hence, in reference to the parties to the judgment, it may be necessary to ascertain whether the thing has been so incorporated with the inheritance as to have vested in the landlord, or to have passed to the heir, or him in reversion or remainder; or whether the thing be one of those kinds of fixtures which a tenant may remove during his term; or which, as personal estate has vested in the particular tenant, or has passed to the executor or administrator of the deceased owner of the land.
*311 As between vendor and. vendee, mortgagor and mortgagee, and as regards the mere question of the title of the defendant, land, in the legal signification, comprehends all ground, soil, or éarth whatever; all minerals are, in this sense, component parts of land; and it comprehends tide-water rivers, lakes, and running streams, as so much land covered with water; it includes all houses, fences, and structures upon the ground; and it also embraces all vegetable productions, as trees, herbage, grass, &c., standing upon and growing out of the soil, (u) If either the owner of the fee simple, a particular tenant, or even a wrong doer builds a house, or annexes to a house then standing upon the land any glass windows, wainscot, benches, doors, vats, furnaces, or the like, they are thereby immediately blended with the land itself, become parcel of it, and vest in the owner of the inheritance, (w) All these things are embraced by the phrase land, in the legal and comprehensive sense of that term; and being so considered as real estate, can only be taken in execution and sold under this statute; and therefore, as such, are bound by the lien consequent upon a judgment against the owner of the inheritance. (x)
But this general rule of law has been considerably relaxed in favour of tenants, and of executors and administrators in England, where land is not liable to be taken in execution and sold by creditors, with a view, as against the heir or owner of the inheritance, to have the fund for the payment of debts extended as much as possible, and also for the public good. (y)
There are some modes by which a tenant may rest a structure upon the land, which precludes the inferences that it was intended to be an annexation to the inheritance; as in the ease of the barn erected upon pattens. (z) And it has been held, that a tenant may take away, during the term, things which he himself affixed to the premises for the purposes of his trade and manufactures; such as furnaces, coppers, salt pans, steam engines, cider mills, a varnish house and the like; and besides these mere trade fixtures, such others as he has put up at his own expense, for the ornament and furniture of his house; as hangings, pier glasses nailed to the *312 wall, ornamental chimney pieces, slabs, blinds, See. And a tenant who is a nurseryman or gardener, may remove trees, shrubs, &c. All these things, although attached to the realty, are regarded as personal chattels in favour of creditors; and therefore are not affected to the prejudice of the tenant or his creditors, by a lien Consequent upon a judgment against the landlord; but may be taken under an execution against the tenant by whom they were put upon the land. But they are only considered as chattels in favour of the tenant and his creditors during the term; for, after that time, if left upon the land, they become parcel of the inheritance. And they are only considered as chattels when placed upon the land by a tenant; for, if put there by the owner of the fee simple, they are then considered as parcel of the realty. As, however, there seems to be as yet no clear and well settled principles of law laid down in relation to what are commonly called fixtures, each case must depend on its own peculiar circumstances. (a)
It is in general true, that all the vegetable productions of the earth, while standing or growing upon the soil, are considered as parcel of the land itself. But they become mere personal property so soon as they are severed from it; and, as such, belong to the owner of the inheritance; unless they are at one and the same time severed and taken away. In which case, not having so rested Upon the land, after having been severed, as to vest in the owner of the inheritance, in their new character of mere personalty, they are held to be a portion of the land. And consequently, in the one case, the wrong doer can only be treated as a trespasser, while in the other he may be charged either criminally or civilly with an illegal asportation of the goods and chattels of another. (b)
By the common law a creditor might take, under a fieri facias, the present annual profits of his debtor’s land; that is, all fruits and crops growing,' such as wheat, corn, tobacco, hemp, carrots, hops, <fcc., and when ripe he might have had them cut, gathered, and sold .as any other mere personal property. As these fruits *313 could not be actually taken before they were ripe and fit to be gathered, a creditor might be deprived of them by the debtor’s aliening the land before they could be taken; but if a growing crop be sold under a fieri facias, the title of the purchaser vests from that time against all others, and he may gather it when ripe. (c)
All annual industrial fruits; such as corn, hops, &c., are commonly called emblements. And these emblements on the death of the owner of the land in fee simple, or intail, pass to his executor ; and so too, in various cases, the executor of the tenant for life shall have the emblements; and consequently, in all such cases, where the fieri facias is levied in the life-time of the debtor, as it evicts the personal property, so taken, from the executor of the deceased, the emblements which otherwise would have passed into the hands of the executor, may, when they ripen after the death of the debtor, be gathered and sold under the fieri facias. But if the owner of the land devises it to another, and dies, then, as the emblements pass to the devisee, the creditor will he thus, as by an alienation by deed, deprived of all satisfaction which he might otherwise have obtained from them. Considering the reason of these rules of law, it would seem, that the lien of a judgment obtained against the owner, in his life-time, would not, of itself, evict the emblements from the executor of the deceased, and prevent them from passing in their ordinary course as personalty. (d)
Besides those subjects of property which constitute a part of the land, as fixtures or emblements, there are others of an incorporeal nature which are in no way visibly attached to the land; hut yet are considered as real estate, though they lie not in tenure; because they issue out of, or concern, or are annexed to, or are exercisable within a corporate, tangible and visible inheritance, which is or may be holden; such as rents, estovers, common, or any other profits whatever granted out of land which savour of the realty; and are, therefore, in most respects, regarded as real estate. Under this general description of incorporeal hereditaments, various kinds of very valuable and productive property are compre *314 hended. As an assessment upon lands; a towing-path, a tollgate, turnpike road stock, canal stock; and, in general, the stock of any incorporated, or joint stock company, the profits of which are derived chiefly, or altogether, from land used in any way whatever, (e)
The consequences of considering all these various kinds of incorporeal hereditaments as real estate, are, that they may be intailed; that, in the absence of any special legislative provision upon the subject, they can only be assigned, or transferred from one to another by the same written solemnities made necessary by law to pass lands; that is, all contracts concerning them must be made according to the provisions of the statute of frauds, and the acts of Assembly which require contracts for land to be in writing and recorded; and all devises of them must be in conformity with those legislative enactments respecting wills of real estate. If the owner of them dies intestate they descend to his heirs, and his widow is entitled to dower therein. And they will be considered as assets like lands, at common law, in the hands of the heir only so far as he may be expressly bound by the obligation of his ancestor.
To this extent the principles of the common law, in relation to this species of property, appear to be clear of all ambiguity and difficulty. But to ascertain how far any of this kind of property is liable to be taken and sold by virtue of a fien facias; and consequently is subject to a judicial lien, it will be necessary to advert to other rules and principles than those by which the difference between real and personal property is defined.
At the time when the principles of the common law in relation to the distinction between real and personal property became established, but a small proportion of the property of the community seems to have been of that incorporeal kind which, is now so very large in amount and so productive. Hence, in the spirit of the simplicity of the common law, it was deemed safest and best to confine the power of the creditor over the property of his debtor to that alone which was visible, tangible and capable of being distinctly valued, sold and transferred, as affording an ample scope for the creditor to obtain the satisfaction to which he was entitled.
*315 Upon these principles the writ oí fieri facias was framed, and in concise and general terms expressed the nature and extent of the sheriff’s power and duty. The language of the execution imports, that the goods and chattels, which are the subject of it, are property of a tangible nature, capable of manual seizure, and of being detained in the sheriff’s custody, and such as are conveniently capable of sale and transfer by the sheriff, to whom the writ is directed, for the satisfaction of a creditor. The legal interest in a term for years, both in respect to the possession of which the leasehold property itself is capable; and also in respect of the instrument by which the term is created and secured, both of which are capable of delivery to a vendee, has been always held to answer the description of the writ, and to be saleable thereunder. So the terms of the writ embraced all the present profits of the debtor’s lands; and, consequently, any crop, although it then grew upon and was considered as a part of the land itself, might be cut, gathered and sold. A rent service, or rent charge, both of which are regarded as realty; and a reversion, after a particular estate then in existence, and any estate for life; or the interest which a husband holds, jure uxoris, during coverture might, under the statute of 1285, be extended by elegit; and therefore a lien attached upon all such freehold interests from the date of the judgment. (f)
That the stock of a turnpike company, or of a canal company, must, upon common law principles, be considered as real estate is sufficiently clear; but whether such stock may be extended as such under an elegit, or may be sold under a fieri facias, is not so certain. In England such stock is commonly declared to be real estate by the act of incorporation itself; (g) but here it has, in several instances, been declared to be personal property. It would seem, that even considered as realty, no lien would attach on obtaining a judgment against the holder unless it could be shewn, that it might be taken in execution; but for that I have met with no authority. If on the other hand such stock should be considered as personalty, then it is clear, even supposing it could be taken in execution, that no lien would arise from the judgment but merely from the execution. (h) It is, however, certain, that *316 in all such cases, where this or any other species of property has been fraudulently or unjustly placed beyond the reach of creditors, a court of equity will interpose and give relief, by setting aside any fraudulent conveyance which may stand in the way; and by ordering the stock to be sold for the benefit of such judgment creditor. (i)
Besides those embarrassments as to the liability of property to be taken in execution arising out of its nature, considered as real or personal; corporeal or incorporeal, there are others occasioned by the peculiarity of the title to it, or the interest of the party against whom the judgment has been obtained.
A rent seek is a species of realty, and may be, in some sense, regarded as the profits of land; yet since it is intangible, and utterly incapable of any manual seizure, or of being taken into the custody of the sheriff; and as a bare rent cannot be delivered ut liberum tinementum, it cannot be taken and sold under a fieri facias, (j) The same reason would seem to apply to all mere charges, incumbrances, or beneficial privileges on land. As where a father, by his will, after devising his lands to his sons, gave his daughter the right, privilege and liberty, of residing in the houses and using and cultivating the land in common with his sons, so long as she remained single; (k) or where a testator gave his wife a home at his mansion-house until his son should attain his full age; (l) or where he gave his land to his son in fee, upon condition, that he should maintain his daughter, or pay her sixty pounds annually during her natural life, (m) These charges were held to be liens upon the land; but as an execution cannot be levied on a lien which a judgment creditor has obtained upon the lands of his debtor, because a lien gives no title to the thing, or interest in the land itself, but merely a power, by levying an execution upon it to have it sold or applied in satisfaction of the claim, (n) it would seem, that none of those peculiar liens could be taken and sold under a fieri facias; and consequently, that no judicial lien could attach upon any such pre-existing lien.
*315 These several kinds of property or rights may therefore be regarded as other instances, in which the liability of beneficial interests in land to be taken in execution, falls short of the power of alienation; for these, and indeed almost every species of contingences may, in equity, be bound by contract for valuable consideration. (o)
It wras a general rule, that the legal estate only could be held liable; and therefore, at common, no use or trust in land could be taken in execution on a judgment against the cestui que use; nor could any such interest be extended under an elegit; because the statute only referred to lands according to the common law. A statute passed in the year 1483, was the first which subjected uses to an execution upon a judgment; (p) which became obsolete after the statute of 1535, for transferring uses into possession. (q) An act passed in the year 1503, was, however, the first which made uses liable to be taken in execution in express terms, (r) But the subsequent revival of uses, under the name of trusts, called for a further interposition of the Legislature; and accordingly by the statute of frauds of 1676, pursuing the language of the statute of 1483, as to uses in respect of trusts, it is declared, that it shall be lawful for the officer to whom any writ shall be directed at the suit of any person upon any judgment, to do, make, and deliver execution unto the parties in that behalf suing of all such lands as any other person shall be seised or possessed in trust for him against whom execution is sued, (s) This provision of the statute of frauds is, however, confined to estates of freehold or lands and tenements, and says nothing as to trusts of chattel interests; consequently, an equitable interest in a term for years could not be taken in execution and sold by a fieri facias. It has also been expressly decided in England, that an equity of redemption of a term for years could not be taken in execution by a fieri facias. And upon the same principles it would seem necessarily to follow, that an equity of redemption of the freehold could not be extended under an elegit. But, as the judgment created a lien upon the equity of redemption of the freehold, the creditor might obtain the benefit of his judgment by going into a court of equity and redeeming any prior incumbrance. (t)
*318 It having been finally settled in Maryland prior to the year 1732, that the immature legal titles awaiting perfection in the Land Office, of which there is now, and always has been a great multitude, were liable, as a species of chattels real, to be taken in execution and sold by a fieri facias, it was to be expected, that in construing and applying the statute of 1732, it would be made to embrace at least all analogous cases of equitable interests, or those inchoate titles which one individual had obtained a right, by a bill for a specific performance, to call upon another to perfect and make a legal title. And there is strong reason to believe that this statute had been always so construed and applied.
Where in England a debtor had, by his will, charged his real estate with the payment of his debts and died without heirs, so that the property escheated, his creditors might have the benefit of such charge by a bill in Chancery making the Attorney-General a party. (u) In Maryland the statute of 1732 having subjected all lands to the payment of debts, did that, in general, which, in England, was only occasionally done by the debtor himself; and consequently, here the Legislature by various acts, in affirmance of the previous course of proceeding, declared, that such escheated real estates might, by bill in Chancery, to which the Attorney-General should be made a party, be sold and applied, without preference, in satisfaction of the debts of the deceased owner. (w) And recognizing the liability of equitable interests to the same extent as legal estates, a similar mode of reaching such equitable interests was given to creditors, where their debtor, who held any such interests, had died without heirs. And it W'as provided, that the purchaser of such equitable interests under the deeree should stand in the place of the person who had died seised or possessed thereof, and might sustain a bill for a specific performance against the holder of the legal estate. And it was further declared, that where any sales of any such equitable titles have been made by virtue of any writ of fieri facias, or decree, the purchaser thereof should have the same title thereto as if the purchase had been made in virtue of the provisions of that act. (x)
These legislative enactments recognize the previously settled law', and affirm the fact, that equitable interests had been before that time taken in execution and sold under writs of fieri facias. *319 Their liability is spoken of as the then established law. It is not said in general terms, that as against those holding such equitable interests, their creditors were in all cases without remedy; but ‘that the creditors of such persons are often without remedy either at law or in equity.’
After the passage of these laws, it was held, in June, 1800, by the Court of Appeals, that an equitable interest in real estate was liable, at the suit of a creditor, to attachment, condemnation and sale, for the satisfaction of a debt due by its owner, (y) The court is not reported to have given any reasons for their judgment; but the decision was considered at that time, as having established the general rule of law, that all equitable interests might be taken in execution under a fieri facias as well as by an attachment. In October of the same year the Chancellor declared, that he so understood it, and says, that ‘he cannot otherwise than remark, that the decision appears, from transactions in this court, and in the Land Office, agreeable to the opinion of the late Chancellor Rogers, as well as of the present Chancellor;’ that is, during the time of the first Chancellor of the Republic. (z) And in the year 1821, these general principles seem to have been again affirmed by the Court of Appeals. (a)
But whatever doubts may have been entertained, as to the existence of the general rule, they have been entirely removed by the act which declares, that any equitable estate or interest which a defendant named in a writ of fieri facias may have in any lands, tenements or hereditaments, may be taken, seized and sold by virtue of such writ, and the purchaser shall have such title assigned to him, and in all respects stand in the place of the person whose title he has purchased. (b) Whether this act shall be considered as having merely affirmed a pre-existing general rule, or as having itself introduced and established a new regulation upon the subject, there yet will remain some difficulty to be removed.
It seems to be agreed even upon English principles, that a judgment is not a lien upon a mere empty legal estate, and that it cannot be extended under an elegit; (c) while on the other hand it must be admitted, that where the whole equitable interest is in the defendant leaving nothing more than a mere empty legal title *320 in any one else, such equitable interest must, according to this law, be held liable to a lien, and to be taken in execution on a judgment against such defendant. (d) But between these extremes, where the lines shall be drawn, and how the relative interests of the parties shall be adjusted, may be, in some cases, the cause of much perplexity; and that not merely in this court; for, by means of this act of Assembly cases involving and resting upon a mere question of equity may thus consequentially be brought within the jurisdiction of a court of common law. (e)
It will be seen from what has been said, that the lien of a judgment at common law arises altogether from the liability of the freehold to be taken in execution and extended or sold for the satisfaction of such judgment. According to the English law, although a decree is equal to a judgment in the administration of the personal assets; yet it gives no such lien upon the realty as that arising from a judgment; because a decree acts only in personam, not in rem; and the remedy upon a decree to affect land is only for a contempt, whereupon the party proceeds to sequestration, which is a mere personal process, (f) But a writ of sequestration binds from the very time of awarding it, and not only from the time of its being laid or of its delivery to the sheriff; and in that respect it gives a lien earlier than a fieri facias, (g) But where lands or the profits of lands, which is all one, are directly in demand, as where the lands or their profits were charged with the payment of a legacy to the plaintiff, the title is bound from the time of filing the bill, and every purchaser pendente lite comes in at his peril. (h)
The act of Assembly prescribes the order in which the debts of a deceased debtor shall be paid out of his real as well as out of his personal assets, giving a preference to judgments, and thus recognizing the lien to which they give rise; but it is silent as to decrees, (i) The testamentary system puts judgments and decrees upon the same footing in the administration of the personal estate; but does not intimate, that a decree gives rise to any lien upon the realty like that attendant upon a judgment at law. (j) There is *321 then no direct legislative enactment upon the subject; and no case is recollected in which the point has been decided by the Court of Appeals.
But it has been declared by an act of Assembly, that ‘it shall and may be lawful for the Chancellor to issue attachment of contempt, attachment with proclamations, and also sequestration against the defendant, until the decree shall be fully performed, fulfilled and executed, and the contempts cleared, or to order process of sequestration to issue to compel a performance of the said decree, by an immediate sequestration of the real and personal estate and effects of the defendant, or such part thereof as may be sufficient to satisfy the demand of the plaintiff in the decree specified and decreed, and to clear the contempts; or to issue fieri facias against the lands, tenements and hereditaments, goods and chattels of the defendant or defendants, upon which sufficient property shall be taken and sold to satisfy the demand of the plaintiff in the decree specified, (k) or a capias ad satisfaciendum may be issued against the defendant or defendants by the Chancellor, upon which there shall be the same proceeding as at law.’
By this act, as by the English statute giving the ¿legit, an election has been given to the party, immediately on obtaining a decree, not merely to sue out the old personal process or to have an execution directing the half of the defendant’s lands to be delivered to him at an extended value; but to have the former process, or a fieri facias, by which the whole of the defendant’s lands may be taken in execution and sold to satisfy the demand of the plaintiff. Whence it necessarily follows, that as lands have been thus made liable to be taken in execution and sold to satisfy a decree, and by the same process as to satisfy a judgment at common law, a decree must, in like manner, give rise to a lien which will bind the land of the defendant. (l)
At common law a plaintiff may, at once, sue out a capias ad satisfaciendum and a fieri facias upon his judgment, and have recourse to the one or the other at his election, so that they be not both of them executed at the same time, (m) But, as from the complex nature of some decrees, requiring certain acts to be performed as well as the payment of money, a fieri facias cannot, in *322 its nature, cover the whole subject of the decree, it would seem, that the plaintiff should not be allowed to vex the defendant unnecessarily by having two or more executions against him at the same time ; that is, to execute a fieri facias for the recovery of the money, and a capias ad satisfaciendum or attachment to enforce a specific performance; but should take one such execution, as, from its terms, may embrace the whole of what he claims under the decree. (n) But even in the case of such complex decrees if the plaintiff is satisfied, or waives all but the money demand, he may then have a fieri facias for that. And therefore it would seem, that, as to mere money demands at the least, this act of Assembly has virtually given to decrees in equity an incidental lien upon real estate, similar to that which is attendant upon a judgment at common law.
In the case under consideration, the sale to Jeremiah Booth was made before, but not ratified until some time after the passage of the act making equitable interests liable to be taken in execution. (o) It could not be considered as a complete bargain and sale; as a perfect contract between the court and Booth until it was finally ratified and assented to by’both parties. And as that was not until after the passage of that act, it must therefore be treated as a case in all respects, and in every point of view, fully within it as to time. In regard to the nature of the equitable interest in the land which Booth acquired by this contract, I am also entirely satisfied that it is such a one as must be held to be embraced by that act.
The principle is believed to be universal, that a judicial lien can *323 only attach upon real estate or an equitable interest in such an estate subject to all prior liens or incumbrances; and that the first lien is, in all cases, entitled to a prior satisfaction, unless it be intrinsically defective. (p) If the legal estate in fee in this land, had been vested in Booth, and he had mortgaged it, the judgment and lien of Stone if McWilliams would only, according to the English law, have given them the right to come here and redeem the prior mortgage; or, according to our law, to have had the land sold, and after satisfying all prior liens to have had the residue of the proceeds of sale applied in whole or in part satisfaction of their claim. Here, the equitable lien held by the court for the benefit of the creditors and heirs of the late Richard Jordan, was a prior incumbrance which must be satisfied: and the proceeds of sale remaining after that, represents the amount and value of that equitable interest in the land upon which the judgment of Stone if McWilliams gave them a lien which followed that interest from the land to the proceeds of sale, so as to entitle them to be paid out of that fund in preference to any subsequent lien upon that interest, or any other of the creditors of Jeremiah Booth. (q)
It is clear then, that the judgment of Stone Sr McWilliams did give them a lien upon the equitable interest held by Jeremiah Booth; but the circumstances of this case suggests another inquiry, in relation to this point, and that is, whether their lien continued to be in full force, at the time they filed their petition, so as to overreach any intermediate claims against Booth?s estate; and to continue to them their right to a preference in satisfaction.
At common law, a man, by a judgment, authenticated his debt, and thereby obtained authority to sue out execution within a year and a day; but, if he failed to do so, it was presumed to be paid; and the defendant might plead payment and a release of such recorded debt; because all judgments were to be rendered effectual within a competent time, which was the same as in case of non-claim. This time of limitation of judgment was the same in real as in personal actions; for though the judgment on a real action settled the right to the land, as in the personal it did to the thing in demand; yet that judgment could not lie dormant forever, to be executed at any time; for then dormant judgments would overreach conveyances between parties, which would be produc *324 tive of the greatest evils, and the most mischievous consequences; and therefore, there was but a year’s time allowed to execute such judgments, as between party and party; where however, the state was plaintiff it might sue out execution at any time after the year without a scire facias. But in debt, if the judgment was not executed, the debt was presumed to be paid, when the judgment lost its force; and therefore, the common law, in such case, gave no scire facias but a new action. (r)
This limitation to the issuing of an execution on a judgment, between party and party, has been repeatedly recognized by our Legislature as being founded, like all other limitations, upon a presumption of satisfaction; and as being, on that ground, an effectual bar to that mode of recovery; and consequently, as furnishing conclusive evidence of the extinction of the lien; since, as has been shown, there can be no lien where there is no right to issue execution. (s)
The statute which gave the scire facias as a new mode of reviving a judgment in personal actions, (t) made no alteration as to the time within which such judgments were to be executed; nor has the act which declares, that on all judgments, thereafter to be rendered, a fieri facias may issue at any time within three years from the date of such judgments, (u) made any other alteration whatever in the existing law. And therefore if a plaintiff, after the time allowed for suing out execution, revives his judgment, its attendant lien can only operate prospectively; and not with any retrospective effect, so as to overreach any intermediate incumbrances or alienations; for, although, as between the parties to the judgment when revived, it may be permitted to operate as a lien upon the property of the defendant from its date; yet, as a legal relation is never suffered to work a wrong, it cannot be allowed to bind the property as against any intermediate incumbrancer, or bona fide purchaser, without notice, but from the date of its revival; (w) and so too, as to deeds, to the validity of *325 which, recording is necessary, the recording of them, after the time prescribed, is not allowed to affect, by relation, the rights and interests of intervening purchasers or creditors. (x)
Such is the nature and continuance of the lien upon real estate arising from a judgment. And, upon similar principles, as a judgment does not, of itself, give rise to any lien upon personal property ; and as the lien upon it can only commence, according to the statute of frauds, from the day of the actual delivery of a fieri facias into the hands of the sheriff, so it continues no longer, by virtue thereof, upon such property than it may be levied upon by such writ of fieri facias; that is, until its return day; after which, if it can he so continued at all, it can only be by the immediate renewal of such execution, or the instant delivery of another fieri facias to the sheriff. (y)
But if a judgment he given on a writ of annuity the plaintiff shall have execution, within the year, after every day of payment, though it he many years after the judgment, (z) And so, if the terms of the judgment suspends for a time the issuing of execution ; or the execution be stayed by an appeal, or writ of error; or the issuing of an execution be prohibited by an injunction, an execution may be issued at any time, within the time allowed, after the expiration of such suspension or stay, or after the dissolution of the injunction ; and consequently, the judicial lien, in all such cases, is so far continued. (a)
The presumption of satisfaction may however be repelled, and the lien sustained in full force by the issuing of an execution, and continuing to re-issue an execution within the time allowed by law after the return of each execution, for any length of time. (b) And so too, where there was a judgment rendered in May, 1787, by virtue of which a lien then fastened upon the land of the defendant; and another judgment rendered in November, 1791, under which that land was regularly taken in execution and sold; and the purchaser who was, in 1796, summoned and appeared to a scire facias on the judgment of 1787, as terre-tenant, without *326 insisting upon the presumption of satisfaction of that judgment, to prevent its lien from being revived so as to overreach that of the judgment of 1791, under which he claimed, unqualifiedly admitted, that the judgment of 1787, had not been paid or in any manner satisfied; it was held, that the lien of the first judgment remained in full force, and bound the lands in the hands of such purchaser, as he had not only failed to plead and rely upon the lapse of time in opposition to it; but by acknowledging the judgment to be unsatisfied, thereby admitted the plaintiff’s right to have execution; and consequently, the continuance of his lien, (c)
At law where the suit abates by the death of a party within the time allowed for suing out execution, or during the continuance of the lien, it may be revived by scire facias, so as thereby to continue the lien from the date of the judgment. And after such an abatement, the plaintiff at law, or his representative, may come in under a creditor’s suit in equity, without reviving the suit at law by a scire facias, and be allowed the benefit of his lien as against the realty, from the date of the judgment, or as against the personalty from the date of the delivery of the fieri facias to the sheriff. As, under such circumstances, this court considers him entitled to the benefit of his lien, without requiring him to make himself out to be a judgment creditor by evidence, strictly speaking, and such as he has a right then to proceed upon at law; (d) since that lien which gave him a preference from its date not having been broken or suspended by a presumption of satisfaction or otherwise; the revival at law of the judgment to which it was incident, merely for the purpose of having it established in favour of or against the new parties would be wholly unnecessary, as all such parties, if not then before the court, might come in under such creditors’ suit. (e)
According to the English law there is no positive limitation against a bill of revivor, or a subpcena scire facias to revive a decree ; yet where there had been a lapse of fifteen years, the proceedings were stayed, (f) Butin Maryland it would seem to have been long since understood, that there was a similar limitation to the issuing of an execution upon a decree as to that of issuing an execution upon a judgment at law; and that no execution can *327 be now issued upon the one or the other after the lapse of three years from their date without a revival. (g)
After the time has elapsed by which the plaintiff is precluded from at once issuing an execution upon his judgment, he may still, if it be not satisfied, instead of a scire facias, have an action of debt upon it; but the institution of such an action, as it is incompatible with, and cannot be prosecuted at the same time, and together with an execution upon the judgment, amounts to a waiver of the lien arising from the right to issue execution; or an admission, that no such lien then exists. (h) There was formerly no positive limitation to an action of debt upon a judgment; but after the lapse of twenty years it would be presumed to have been satisfied, unless the delay could be sufficiently accounted for. (i) But by our act of Assembly the bringing of such an action of debt has been expressly limited to twelve years, (j)
It appears from the proceedings and the testimony taken in support of the claim of &'tone 4f Me Williams, that at the August term, 1822, of St. Mary’s County Court, they obtained a judgment against James Walker and Jeremiah Booth, for the before mentioned amount, from which judgment Walker and Booth appealed; and, after the case had been taken to the Court of Appeals, and placed there for argument, Jeremiah Booth, on the 10th November, 1824, died; that afterwards, at June term, 1825, of the Court of Appeals, the judgment of the county court was affirmed; and that a part of the judgment so affirmed had been satisfied by Walker, who had since become totally insolvent. There has been here therefore not only a considerable lapse of time since the rendition of the judgment by the county court, but an abatement by the death of Booth since the judgment was rendered.
But it has been declared, that no case in the Court of Appeals, *328 under a rule argument, should abate by the death of either of the parties; and that the court might give judgment as if the party were alive; and the judgment should have the same effect as if it had been rendered in favour of, or against the deceased, (k) According to this law, the lien commencing with the judgment of the county court was stayed, suspended and continued by the appeal; and must be considered as having been finally affirmed by the .judgment of the Gourt of Appeals in favour of Stone §• McWilliams -against Jeremiah Booth, as of June, 1825. (l) As the case could ■not abate after it had reached the Gourt of Appeals and had been there placed under a rule argument, the plaintiffs could not have been expected or required to revive their judgment until after the Court of Appeals had pronounced its decision. But after that, although the lien then subsisted in full force; because there could then be no laches imputed to the plaintiffs, nor then any presumption that (heir judgment had been satisfied; (m) yet no execution at law could have been sued out against the representatives of Booth until the plaintiffs had made them parties to their judgment; which, it seems, has not yet been done.
It is clear, that, since the passage of the act enlarging the time for suing out executions on judgments, (n) there could be no presumption, that this judgment of Stone ¿y McWilliams had been satisfied until after the lapse of three years from June, 1825, when it was affirmed by the Court of Appeals; and consequently, their lien remained in full force in March, 1828, when they filed their petition in this case. That petition must, at least in equity, be considered as in all respects equivalent to the suing out of a scire facias to revive the judgment against the representatives of Booth; and to entitle them to the full benefit of their lien so as to give them a preference in satisfaction; since, under all the circumstances of the case, it would have been utterly nugatory to have proceeded at law, or to have attempted to obtain satisfaction of their claim in any other way. (o) It is then clear that Stone fy McWilliams, at the time they filed their petition, had a valid and subsisting lien upon this equitable interest of Booth's.
Having thus disposed of the objections to the judgment of Slone 8; McWilliams, it now becomes necessary to attend to the claims *329 and pretensions of the heirs of Jordan. They allege and argue, that Booth, the purchaser, having been one of the sureties in the bond given by Edmund Key, their guardian, could never have obtained a legal title to the real estate bought by him, until the amount claimed by them was fully paid; that he was bound to see to the proper application of the purchase money, and not having done so; and the money he paid to Key, their guardian, having been wasted, it was, as to them, no payment: and therefore the equitable lien, held by the court, still subsisted for their benefit, to enable them to enforce the payment of the whole purchase money which has not come to their hands; and further, that they, as bond creditors of Booth, have a right now to come here and have their claim tacked to the equitable lien of the court, and satisfied along with it in preference to any other of the creditors of Booth.
It will be seen by adverting to the proceedings, that sundry payments which had been made by Booth, the purchaser, to Key, as the guardian of these then infant heirs of Richard Jordan, deceased, were made with their consent expressed after they attained their full age, and were thereupon ratified and confirmed by the orders of the court; and therefore, as to all matters covered by such consent and by the judgment of the court thereupon, it is now entirely too late to have them opened for re-adjudication, in order to let in any claim of which these heirs were then fully apprised, and which they might then have made. They can now sustain no claim in opposition to the past orders of the court, in the passing of which they have not, and cannot allege and shew, that there has been any fraud, surprise, error, or mistake; and consequently their claim must be considered and disposed of entirely in accordance with those past judgments of the court; that is, as being a claim against Key, their late guardian, for whose default they may hold Booth liable as one of Key’s sureties in his guardian’s bond.
The only cases in which a purchaser is bound to see to the application of the purchase money are where a trust has been raised by deed or will for the sale of an estate for the payment of debts and the like; and the trust so raised is of a defined and limited nature. (p) But such is not the case now before the court. This sale to Booth was made under a decree in a creditor’s suit. A purchaser under a decree can have no concern with the disposition which the court may make of the purchase money; nor can his *330 right, as a purchaser, be in any manner affected by any irregularity in the case, or misapplication of the purchase money. When he pays the whole of the stipulated amount he is entitled to an absolute conveyance of the whole right of the parties to the suit, whatever that may be, and is not bound to look to any thing beyond the express terms of his contract with the court, as reported by the trustee employed to make the sale. (q)
Where a mortgagee has made further advances to the mortgagor, and taken his bond, binding himself and his heirs, to secure payment, the mortgagee may tack such bond debt to his mortgage as against the heir or devisee of the mortgagor, who shall not be allowed to redeem .without paying the bond as well as the mortgage debt. This, however, is solely a matter of arrangement to prevent circuity of suits; for in natural justice, the claim has no foundation. But this tacking of the bond debt to the mortgage is never allowed, in any case, to the prejudice of creditors whose claims, as to the bond debt, are of equal degree, (r) Here the heirs of Jordan are not mortgagees; but merely have an interest in the equitable lien held by the court for their benefit only so far as there might be a surplus after the payment of all the creditors of Richard Jordan, deceased. These heirs of Jordan may, it is true, in respect to the guardian’s bond by which Booth was bound as a surety, be considered as bond creditors of Booth. But a mere bond can give them no lien whatever upon the estate of Booth, and they certainly cannot be allowed to come here and have their bond debt tacked to the equitable lien of the court, to the prejudice of the judgment and other creditors of Booth.
There is therefore, no foundation for these alleged superior claims and pretensions of the heirs of Richard Jordan, deceased. They can only stand here as bond creditors against the estate of Jeremiah Booth, deceased, and take subject to all prior liens, and pro rata with the other creditors of Booth in equal degree.
Whereupon it is Ordered, that this case be and the same is hereby referred to the auditor with directions to state such account as the nature of the case may require; in which he will consider the claim of Stone fy McWilliams as founded on a judgment against the late Jeremiah Booth, James Walker being insolvent, taking date from its rendition in the county court. And the claim *331 of Richard Jordan and Lee and wife as founded on a bond given by Jeremiah Booth, his co-obligor Edmund Key being insolvent. And it is further Ordered, that the said exceptions of the parties, so far as they may be inconsistent with this order, be and they are hereby overruled.
In a report made in obedience to this order, and filed on 4th of February, 1831, the auditor says, that he had again examined the proceedings and stated certain additional claims, lately exhibited, which were numbered from 5 to 9, inclusive. That No. 5, was on a judgment rendered against James Walker and Jeremiah Booth, on the 8th of August, 1821, prior to the judgment of Slone &■ McWilliams’ claim, No. 3. But that the judgment was not under seal; and there was no affidavit of the assignor; it also appeared, from an endorsement on the short copy filed, that the judgment had been enjoined in equity. That No. 6, No. 7, and No. 9, were judgment claims, but were not proved in the usual manner; and were subsequent to the judgment claim, No. 3, which was more than equal to the fund to be distributed. And that he had stated an account applying the balance left unappropriated by his report of the 31st of July, 1829, to the payment of the additional costs, claim No. 5, and a part of the judgment claim of Stone &f McWilliams, No. 3.
After which, on the 7th of February, 1831, the petitioners Lee and wife and Richard Jordan, excepted to the allowance made by the auditor in his report and account filed on the 19th of June, 1826, of the said sum of one thousand dollars as a credit to said Booth on account of the said purchase money; because, among other reasons, the said payment does not appear to have been authorized by any order of the court. And they further excepted to the allowance of all other items and payments in said account as credits as aforesaid not appearing to have been authorized by the court or any order thereof.
7th February, 1831.
Bland, Chancellor.
Ordered, that this last report of the auditor be and the same is hereby ratified and confirmed; and that the exceptions this day filed be overruled; and the trustee is directed to apply the proceeds accordingly: except as to the claim No. 5; the determination upon which is hereby suspended until the 24th of March next; at any time after which day, the said claim No. 5, may be finally disposed of, on the application of any party interested in, or affected by it.
*332 The case stood over accordingly, after which time, at the instance of the claimants Stone McWilliams, it was again brought before the court.
26th March, 1831.
Bland, Chancellor.
It appearing from a careful inspection of the voucher of claim No. 5, which was filed on the 27th of December last, that the injunction by which the execution of the judgment might have been, at one time suspended, had been dissolved; and the voucher of that claim having been filed long after the expiration of the time allowed for the creditors to bring in their claims; and the other objections to it, as stated by the auditor, not having been removed, as allowed by the order of the 7th pf February last. It is therefore Ordered, that the said claim of Philip Turner, designated as claim No. 5, be and the same is hereby rejected; and the trustee is directed to apply the proceeds, awarded by the auditor to it, in satisfaction of the said claim of Stone McWilliams designated as No. 3.
From these last orders, of the 18th of January, 7th of February and 26th of March, 1831, the petitioners Lee and wife and Richard Jordan appealed, and they were at the December term, 1832, of the Court of Appeals, affirmed. Lee and wife and Jordan v. Stone & McWilliams, 5 G. & J. 1.

 Spurrier v. Spurrier, 1 Bland, 475; Kilty v. Quynn, ante 212.

 Williamson v. Wilson, 1 Bland, 435; Gilb. Execu. 17.

 Andrews v. Scotton, 2 Bland, 629; Casamajor v. Strode, 1 Cond. Cha. Rep. 195.

 13 Ed. 1, c. 18 ; 11 Ed. 1; 13 Ed. 1, stat. 3; 27 Ed. 3, c. 8 and 9 ; 36 Ed. 3, c. 7; 23 Hen. 8, c. 6; Forum Rom. 87.

 2 Inst. 469; Gilb. Execu. 37; Gilb. Court of Excheq. 93; Jefferson v. Morton, 2 Saund. 6; Underhill v. Devereux, 2 Saund. 69, 71.

 Powel Mortg. 255, n. K., 273, n. O.; Harris v. Saunders, 10 Com. Law Rep. 373.

 Taylor v Horde, 1 Burr. 115; June, 1773, ch. 1; November, 1782, ch. 23; Newton v. Griffith, 1 H. &.G. 111.

 Finch v. Winchelsea, 1 P. Will. 278 ; Forth v. Norfolk, 4 Mad. 503.

 1820, ch. 191; Newton v. Griffith, 1 H. & G. 129.

 June, 1773, ch. 1; November, 1782, ch. 23.

 Paca v. Forwood, 2 H. & McH. 175 ; Ridgely v. McLaughlin, 3 H. &. McH. 220; Laidler v. Young, 2 H. & J. 69.

i) 3 and 4 W. & M. c. 14; 1 Fonb. 284; Kinaston v. Clark, 2 Atk. 204; Hammond v. Gaither, 3 H. & McH. 218.

 Gilb. Execu. 3.

 Bac. Abr. tit. Dower, G.; Abergaveny’s case, 6 Co. 79.

 2 Blac. Com. 141.

 Powel Mortg. 605, 609, 611.

 Co. Litt. 117, 124.

 Hall v. Mullin, 5 H. & J. 190; Cunningham v. Cunningham, Cas. Conf. North Carol. 353; Walker v. Bostick, 4 Desau. 266.

 Davy v. Pepys, Plow. 439; Sir William Harbert’s case, 3 Co. 12; Drake v. Mitchell, 3 East. 258; Kinaston v. Clark, 2 Atk. 204; Galton v. Hancock, 2 Atk. 428; Stileman v. Ashdown, 2 Atk. 609; Powel Mortg. 598, 777.

 Co. Litt. 102; Sir William Harbert’s, 3 Co. 12; Gree v. Oliver, Carth. 245; Bac. Abr. tit. Execution, I; 2 Blac. Com. 340, n. 71; Bull. N.P. 175; 2 Harr. Ent. 689.

 Attorney-General v. Stewart, 2 Meriv. 153.

 Roberdeau v. Rous, 1 Atk. 544; Higgins v. The York Buildings Company, 2 Atk. 107; Kinaston v. Clark, 2 Atk. 206; Stonehewer ti. Thompson, 2 Atk. 441; Stileman v. Ashdown, 2 Atk. 481, 609; S. C. Amb. 13; Curtis v. Curtis, 2 Bro. C. C. 633; Leaby v. Dancer, 12 Cond. Chan. Rep. 164.

 Land Hol. Assis. 91, 115, 251 and 494, note.

 1798, ch. 101, sub ch. 14, s. 3.

 Land Hol. Assis. 218; Harvey v. Harvey, 3 Rep. Chan. 87.

 1704, ch. 13; 1720, ch. 28; 1727, ch. 20.

6) ‘The British merchants,’ says Governor Pownal, ‘at times applied to Parliament on the affairs of the colonies. Hence we find enacted the navigation act, &c. Also acts : 1. Altering the nature of their estates, by treating real estates as chattels ; 2. Restraining them from manufactures; 3. Regulating their money ; 4. Altering the nature of evidence in the courts of common law, by making an affidavit of a debt before the Lord Mayor of London, &c. certified in writing an evidence in their courts in America; 5. Dissolving indentures, by discharging such of their servants as should enlist in the king’s service.’ — Powm. Admin. Colonies, 126 — ith edition, published in 1768.
This, to us, most important statute, having a very limited operation upon the interests of the people of England, is so rarely noticed in any of the English law *305 books in use among us, that I have deemed it proper to insert it here entire and verbatim from the British statute book. — 8 George 2, c. 7.
‘An act for the more easy Recovery of Debts in his Majesty’s Plantations and Colonies in America.’
‘Whereas his Majesty’s subjects trading to the British Plantations in America lie under great difficulties, for want of more easy methods of proving, recovering and levying of debts due to them, than are now used in some of the said Plantations; And whereas, it will tend very much to the retrieving of the credit formerly given by the trading subjects of Great Britain to the natives and inhabitants of the said Plantations, and to the advancing of the trade of this kingdom thither if such inconveniences were remedied.
‘May it therefore please your Majesty that it may be enacted, And be it enacted by the King’s Most Excellent Majesty, by and with the advice and consent of the Lord’s Spiritual and. Temporal, and Commons, in this present Parliament assembled, and by the authority of the same, That from and after the twenty-ninth day of September which shall be in the year of our Lord one thousand seven hundred and thirty-two, in any action or suit then depending, or thereafter to be brought in any court of law or equity in any of the said Plantations, for, or relating to any debt or account wherein any person residing in Great Britain shall be a party, it shall and may be lawful to and for the plaintiff or defendant, and also to and for any witness to be examined or made use of in such action or suit, to verify or prove any matter or thing by affidavit or affidavits in writing upon oath, or in case the person making such affidavit be one of the people called Quakers, then upon his or her solemn affirmation, made before any mayor, or other chief magistrate of the city, borough or town corporate in Great Britain, where or near to which the person making such affidavit or affirmation shall reside, and certified and transmitted under the common seal of such city, borough, or town corporate, or the seal of the office of such mayor, or other chief magistiate, which oath and solemn affirmation every such mayor and chief magistrate shall be, and is hereby authorized and empowered to administer; and every affidavit or affirmation so made, certified and transmitted, shall in all such actions and suits, be allowed to be of the same force and effect, as if the person or persons making the same upon oath or solemn affirmation as aforesaid, had appeared and sworn or affirmed the matters contained in such affidavit or affirmation viva voce in ■open court, or upon a commission issued for the examination of witnesses, or of any party in any such action or suit respectively; provided that in every such affidavit and affirmation, there shall be expressed the addition of the party making such affidavit or affirmation, and the particular place of his or her abode.
‘2. And be it further enacted by the authority aforesaid, That in all suits now depending, or hereafter to be brought in any court of law or equity, by or in behalf of his majesty, his heirs and successors, in any of the said Plantations, for or relating to any debt or account, that his majesty, his heirs and successors, shall and may prove his and their debts and accounts, and examine his or their witness or witnesses, by affidavit or affirmation, in like manner as any subject or subjects is or are ■empowered, or may do by this present act.
‘3. Provided always, and it is hereby enacted, That if any’ person making such affidavit upon oath or solemn affirmation as aforesaid, shall be guilty of falsely and wilfully swearing or affirming any matter or thing in such affidavit or affirmation, which, if the same had been sworn upon on examination in the usual form, would *306 have amounted to wilful and corrupt perjury, every person so offending,, and being thereof lawfully convicted, shall incur the same penalties and forfeitures as by the laws and statutes of this realm are provided against persons convicted of wilful and corrupt perjury.
‘4. And be it further enacted by the authority aforesaid, That from and after the said twenty-ninth day of September, one thousand seven hundred and thirty-two, the houses, lands, negroes, and other hereditaments and real estates, situate or being within any of the said Plantations belonging to any person indebted, shall be liable to and chargeable with all just debts, duties and demands, of what nature or kind soever, owing by any such person to his majesty, or any of his subjects, and shall and may be assets for the satisfaction thereof, in like manner as real estates are by the law of England liable to the satisfaction of debts due by bond or other specialty, and shall be subject to the like remedies, proceedings and process, in any court of law or equity, in any of the said Plantations respectively, for seizing, extending, selling or disposing of any such houses, lands, negroes, and other hereditaments and real estates, towards the satisfaction of such debts, duties and demands, and in like manner as personal estates in any of the said Plantations respectively are seized, extended, sold or disposed,of, for the satisfaction of debts.’
Every honest man should by his will charge his real estate with the payment of his debts; he who omits it, is said to sin in his grave. — Per Ld. Mansfield; Wyndham t>. Chetwynd, 1 Burr. 430.
A Singular instance is mentioned of a fraud perpetrated by a bishop who invested his money in land to prevent his creditors from obtaining satisfaction after his death. — 1 Hallarn Const. His. Eng. 275, note 5.

 Rawlings v. Stewart, 1 Bland, 22, note.

 Davidson v. Beatty, 3 H. & McH. 608, 612. — Chancery Proceedings, lib. W. K. No. 1 ,fol. 1.

 Lewis v. Bacon, 3 Hen.'8c Mun. 89.

 Graff v. Smith, 1 Dall. 481; 4 Com. Dig. 228, 245; Wilkinson v. Leland, 2 Peters, 658; Robinson v. Noel, 2 Cas. Cha. 145; Blankard v. Galdy, 4 Mod. 226.

 2 Edwards’" His. Westlnd. 366; 3 ibid. 214

 Baker v. Webb, 1 Hayw. 62; Winstead v. Winstead, 1 Hayw. 243.

 Galphin v. McKinney, 1 McCord, 292; Telfair v. Stead, 2 Cran. 418; Thompson v. Grant, 1 Russ. 540, note; Will. Exrs. 1017.

 1 Jefferson Corr. 106; 1734, ch. 25, 4 Hen. Stat. 452; 1744, ch. 40, 5 Hen. Stat. 292; 1748, ch. 12, 5 Hen. Stat. 526; 1759, ch. 34, 7 Hen. Stat. 328; 1761, ch. 28, 7 Hen. Stat. 450.

 Lewis v. Bacon, 3 Hen. & Mun. 89.

 Morgan v. Davis, 2 H. & McH. 12; Donaldson v. Harvey, 3 H. & McH. 13; Davidson v. Beatty, 3 H. & McH, 608; Kilty’s Rep, 250; Tayloe v. Thompson, 5 Peters, 358.

 2 Harr. Ent. 678.

 13 Ed. 1, c. 18.

 Gilb. Execu. 37.

 Hampson v. Edelen, 2 H. & J. 64.

 2 Inst. 198, 397; 1 Niebuhr’s His. Rom. 437.

 West v. Hughes, 1 H. & J.6; 1799, ch. 86; 1801, ch. 42, s. 2.

 1809, ch. 76, s. 4; 1814, ch. 82; Duvall v. Waters, 1 Bland, 590. This matter has been since disposed of by the act of 1831, ch. 290. Den. v. George, Taylor’s Rep. 22.

 Gilb. Execu. 41, 42; Ridgely v. McLaughlin, 3 H. & McH. 220.

 Co. Litt. 4.

 Co. Litt. 53; Herlakenden’s case, 4 Co. 62.

 Ryall v. Rolle, 1 Atk. 175; Ex parte Quincy, 1 Atk. 477; Steward v. Lombe, 5 Com. Law Rep. 167; Winn v. Ingilby, 7 Com. Law Rep. 214; Colegrave v. Dias Santos, 9 Com. Law Rep. 30; Am. and Fer. Fixtures, ch. 5; Bradley v. Osterhoudt, 13 Johns. 404; Kirwan v. Latour, 1 H. & J. 289.

 Lawton v. Lawton, 3 Atk. 13.

 Elwes v. Maw, 3 East. 38.

 Beck v. Rebow, 1 P. Will. 94; Dudley v. Warde, Amb. 113; Lawton v. Lawton, 3 Atk. 13; Poole’s case, 1 Salk. 368; Fitzherbert v. Shaw, 1 H. Blac. 258; Elwes v. Maw, 3 East. 38; Wyndham v. Way, 4 Taunt. 316; Lee v. Risdon, 2 Com, Law Rep. 69 ; Bull, N. P. 34; Am. and Fer. Fixtures, ch. 2; Holmes v. Tremper, 20 John. 29; Van Ness v. Pacard, 2 Peter. 137; Steward v. Lombe, 5 Com. Law Rep. 168; Buckland v. Butterfield, 6 Com. Law Rep. 18; Farrant v. Thompson, 16 Com. Law Rep. 62.

 Herlakenden’s case, 4 Co. 62.

 Peacock v. Purvis, 6 Com. Law Rep. 154. It has been since declared, that where land shall have been rented in consideration of a render of a portion of the crop, or for a specific amount of produce, it shall not be lawful, under any process against the tenant, to sell the crop before it shall be divided, but the same may be sold subject to the lessor. — 1831, ch. 171.

 Com. Dig. tit. Execution, C. 3 and C. 4; Am. and Fer. Fixtures, 173 ; Jac. Dict. v. Emblements.

 Co. Litt. 19; Morgan v. Mansel, 2 Plow.; The King v. The Mayor of London, 4 T. R. 21; The King w. Page, 4 T. R. 543; Drybutter v. Bartholomew, 2 P. Will. 127; Buckeridge v. Ingram, 2 Ves., jun., 652; Knapp v. Williams, 4 Ves. 430, note; Finch v. Squire, 10 Ves. 41; Powel Mortg. 142.

 2 Inst. 394; Underhill v. Devereux, 2 Saund. 69; Arbuckle v. Cowtan, 3 Bos. & Pull. 322; Scott v. Scholey, 8 East. 467; Gilb. Execu. 39; Powel Mortg. 255, note K, 599, note W.

 Powel Mortg. 24, note.

 Shaw v. Wright, 3 Ves. 22; Knapp v. Williams, 4 Ves. 430, note. It has been since provided by the act of 1832, ch. 307, that under a fieri facias, or attachment, any interest which the defendant *316 may have in the capital or joint stock of any corporation, or in the debt of any corporation transferable on its books, may be taken and sold in the manner therein prescribed. But whether a lien fastens upon any such property from the date of the judgment or only from the delivery of the fieri facias to the sheriff, or otherwise, remains to be determined.

 Horn v. Horn, Amb. 79; Caillaud v. Estwiek, 2 Anstr. 381; Denton v. Livingston, 9 John. 96 ; Hadden v. Spader, 20 John. 554.

J) Powel Mortg. 599, note W.

 Warfield v. Gambrill, 1 G. & J. 503.

 Addison v. Bowie, 2 Bland, 606

 Rebecca Owing’s case, 1 Bland, 290.

 Harding v. Stevenson, 6 H, & J. 267.

 Conrad v. The Atlantic Insurance Company, 1 Peter. 443; Wright v. Wright, 1 Ves. 409; Carleton v. Leighton, 3 Meriv. 667 —

 1 Rich. 3, c. 1.

 27 Hen. 8, c. 10.

 19 Hen. 7, c. 15.

 29 Car. 2, c. 3, s. 10.

 Powel Mortg. 255, 309, 601; Scott v. Scholey, 8 East. 467; Metcalf v. Scholey, 5 Bos. & Pull. 461.

 Mitf. Plea. 172.

 October, 1780, ch. 51, s. 5; 1785, ch. 78.

 1792, ch. 44; 1794, ch. 60; 1795, ch. 88, s. 2 and 3.

 Campbell v. Morris, 3 H. & McH. 535; Pratt v. Law, 9 Cran. 456, 495; Campbell v. Pratt, 5 Wheat. 429.

 Hopkins v. Stump, 2 H. & J. 302.

 Ford v. Philpot, 5 H. & J. 312.

 1810, ch. 160.

 Powel Mortg. 274, note.

 Jackson v. Willard, 4 John. Rep. 41.

 Scott v. Scholey, 8 East. 467; Archer v. Snapp, Andrews, 341; Hopkins v. Stump, 2 H. & J. 301; Harding v. Stevenson, 6 H. & J. 264.

 Powel Mortg. 547; Ram. on Assets, 292.

 Burdett v. Rockley, 1 Vern. 58; Bligh v. Darnley, 2 P. Will. 621; Forum Rom. 87.

 Crofts v. Oldfield, 3 Swan. 278, note.

 1785, ch. 80, s. 7.

 1798, ch. 101, sub ch. 8, s. 17.

 1785, ch. 72, s. 25.

 Bligh v. Darnley, 2 P. Will. 622; Forum Rom, 87.

 Miller v. Parnell, 1 Com. Law Rep. 414; Primrose v. Gibson, 16 Com. Law Rep. 78.

 Dickins v. Hiffner. — In this case a decree having been passed for a conveyance of a tract of land as therein specially described, and also for costs; the plaintiff by his petition, on oath, stated, that the defendant had been regularly served with a copy of the decree, but had complied with no part of it. Whereupon he prayed an attachment, which was awarded and returned attached. After which the plaintiff by petition prayed for a fieri facias for the costs; and an attachment of contempt for the non-performance of the other part of the decree.
1807. — Kilty, Chancellor. — The Chancellor was not satisfied that he had the power, under the act (1785, ch. 72, s. 25) to issue a fieri facias in the manner prayed. The allowance of that kind of execution appears to be for cases in which the property sold can satisfy the demand of the plaintiff in the decree specified. It is possible, that if every other part of the decree was complied with, a fieri facias might then issue for the costs; but it does not appear regular to issue one kind of execution or process for one part of the decree, and another for another. The party' may either proceed with his attachment in the usual manner, or without proceeding on the one served, take out a writ of capias ad satisfaciendum against the defendant, as that kind of execution will go to the whole. — M. S.

 1810, ch. 160-.

 Powel Mortg. 435; Rankin v. Scott, 12 Wheat. 179.

 Davidson v. Clayland, 1 H. & J. 546; Jones v. Jones, 1 Bland, 451; Lewis v. Zouche, 2 Cond. Chan. Rep. 470.

 Gilb. Execu. 12, 26, 92, 95; Gilb. Court of Exchequer, 166; Anonymous, 2 Salk. 603; Stileman v. Ashdown, 2 Atk. 609; Eppes v. Randolph, 2 Call. 125; Nimmo v. The Commonwealth, 4 Hen. & Mun. 57; Coleman v. Cocke, 6 Rand. 629; Rankin v. Scott, 12 Wheat. 179; The United States v. Morrison, 4 Peters, 124.

 May, 1766, ch. 7; February, 1777, ch. 15, s. 7; October, 1778, ch. 21, s. 7; Bac. Abr. tit. Limitation of Actions, E. 6.

 13 Ed. 1. C. 45.

 1823, ch. 194.

 Jacob Law Dict. v. Relation; Heapy v. Parris, 6 T. R. 368; Lord Mahon’s case, 6 Mod. 59; Anonymous, 3 Atk. 521; Fothergill v. Kendrick, 2 Vern. 234; Bothomly v. Fairfax, 2 Vern. 751; S. C. 1 P. Will. 335.

 1785, ch. 72, s. 13 ; 1831, ch. 304; Panned v. The Farmers Bank, 7 H. & J. 202.

 Oades v. Woodward, 1 Salk. 87; Heapy v. Parris, 6 T. R. 368; Williams v. Bradley, 2 Hayw. 363. —

 2 Inst. 471.

 2 Inst. 471; Blacklock v. Maddox, 2 Harr. Ent. 694; 1799, ch. 79, s. 10 ; 1826, ch. 157; Underhill v. Devereux, 2 Saund. 72, c. note; Michell v. Cue, 2 Burr, 660; Franklin v. Thomas, 3 Meriv. 234.

 2 Inst. 471; Bac. Abr. tit. Scire Facias, C. 1; Bing. Execu. 161; Cooke v. Batthurst, 2 Show. 235 ; Mullikin v. Duvall, 7 G. &.J. 355.

 Ridgely v. Gartrell, 3 H. & McH. 449 ; Bing. Execu. 161.

 Robinson v. Tonge, 3 P. Will. 398; Burroughs v. Elton, 11 Ves. 36; Rowe v. Bant, 1 Dick. 150.

 Drewry v. Thacker, 3 Swan. 529; Clarke v. Ormonde, 4 Cond. Cha. Rep. 54.

 Comber’s case, 1 P. Will. 767.

 Barrington v. O’Brien, 1 Ball & Be. 173; Matthews’ Presum. 470; Thomas v. Harvie, 10 Wheat. 146; Berrett v. Oliver, 7 G. & J. 207.
Stump v. Hopkins. — On the petition in this case a ca. sa. was ordered, on the return of which it was moved to quash the execution, because more than a year had elapsed from the date of the decree before the application for the ca. sa.
1806. — Kilty, Chancellor. — This objection is such as to cause some doubt, and to require consideration; therefore, the execution must be quashed as having been erroneously issued. — M. S.; Forum Rom. 192 ; 1823, eh. 194.

 Selwin, N. P. 627 ; 3 Blac. Com. 160, note; Bates v. Lockwood, 1 T. R. 638; Holmes v. Wainewright, 1 Swan. 28; Sasscer v. Walker, 5 G. & J. 103.

 Kemys v. Ruscomb, 2 Atk. 45; Hales v. Hales, 1 Rep. Cha. 105; Winchcomb v. Winchcomb, 2 Rep. Cha. 101

 1715, ch. 23, s. 6; Hammond v. Denton, 1 H. & McH. 200.

 1806, ch. 90, s. 11; 1815, eh. 149, s. 5 and 6; Green v. Watkins, 6 Wheat. 261.

 Bac. Abr. tit. Abatement, F; Penoyer v. Brace, 1 Ld. Raym. 244.

 Garnon’s case, 5 Co. 88; Howard v. Pitt, Carth. 236; S. C. 1 Show. 402.

 1823, ch. 194.

 Robinson v, Tonga, 3 P. Will. 398; Burroughs v. Elton, 11 Ves. 36.

 Sug. Ven. and Pur. 366.

 Bennett v. Hamill, 2 Scho. & Lefr. 577, 581; Burke v. Crosbie, 1 Ball. & Bea. 501; Lloyd v. Johnes, 9 Ves. 65; Curtis v. Price, 12 Ves. 105.

 Powel Mortg. 348, 526, 1019.